No. 24-7154

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

**CHERYL WALKER,**

*Plaintiff-Appellee,*

v.

**UBER TECHNOLOGIES, INC. et al.,**

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, Case No. 1:23-cv-03976
The Honorable Amit P. Mehta, United States District Judge

## APPELLANTS' OPENING BRIEF

Jacob Taber
PERKINS COIE LLP
1155 Sixth Avenue, 22nd Floor
New York, NY 10036
Telephone: 212.261.6907
JTaber@perkinscoie.com

Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street, N.W.,
Suite 800
Washington, D.C. 20005-3960
Telephone: 202.942.8667
JTietz@perkinscoie.com

June 25, 2025

Michael R. Huston
PERKINS COIE LLP
2525 East Camelback Road
Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
MHuston@perkinscoie.com

*Attorneys for Uber Technologies, Inc.,
Rasier, LLC, and Rasier-DC, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a), the following is a statement of the parties, amici, rulings under review, and related cases:

### I. Parties and Amici

- **Plaintiff-Appellee:** Cheryl Walker, individually and as power of attorney for Carroll Walker.

- **Defendants-Appellants:** Uber Technologies, Inc.; Rasier, LLC; and Rasier-DC, LLC.

- **Amici:** None

### II. Rulings Under Review

1. The Order of the United States District Court for the District of Columbia entered on September 11, 2024 (Dkt. 26), denying Uber's Motion to Compel Arbitration as to Plaintiff Carroll Walker's claims (as amended February 14, 2025 (Dkt. 36)).

2. The Order of the United States District Court for the District of Columbia entered on February 14, 2025 (Dkt. 35), denying Uber's Motion for Reconsideration of the Court's denial in part of Uber's Motion to Compel Arbitration.

### III. Related Cases

Defendants-Appellants are aware of no related cases.

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure and Circuit Rule 26.1, Defendants-Appellants provide the following disclosures:

Uber Technologies, Inc. ("Uber") is a publicly held corporation and not a subsidiary of any entity. Uber is unaware of any shareholder who beneficially owns more than 10% of Uber's outstanding stock. Rasier, LLC is a wholly owned subsidiary of Uber. Rasier-DC, LLC is a wholly owned subsidiary of Rasier, LLC.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal involves multiple important issues of law concerning the enforceability of a contractual arbitration agreement. Appellants' counsel will be prepared to discuss the relevant legal issues with the Court at oral argument, as well as to explain how the factual record bears on the correct legal analysis here. Counsel believes that oral argument would aid the Court in its consideration of this appeal.

## TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings Under Review, and Related Cases .....i

Corporate Disclosure Statement ............................................................ii

Statement Regarding Oral Argument ................................................. iii

Table of Authorities......................................................................... vi

Glossary ........................................................................................xiii

Introduction ........................................................................................1

Jurisdiction.........................................................................................4

Issue Statement...................................................................................5

Pertinent Statutes...............................................................................5

Statement of the Case .........................................................................6

    A.    Statutory Background...........................................................6

    B.    Factual Background..............................................................7

        1.    Uber's Rides platform and its terms of use .................7

        2.    Mrs. Walker agreed to Uber's terms of use and
            frequently used Uber's services. ................................10

        3.    Mr. Walker agreed to the terms of use by
            accepting guest rides arranged by Mrs. Walker. ........11

    C.    Proceedings Below.............................................................12

        1.    The Walkers asserted claims in federal court
            against Uber and the driver. ......................................12

        2.    The district court denied (in part) Uber's motion
            to compel arbitration.................................................14

        3.    The district court denied Uber's motion for
            reconsideration.........................................................16

Summary of Argument.......................................................................18

Standard of Review ...........................................................................20

Argument...........................................................................................21

I.   Mr. Walker's claims are subject to arbitration because he agreed to Uber's terms of use............................................21

     A.   Mr. Walker took a ride after being informed that doing so would manifest his agreement to Uber's hyperlinked terms of use. ..............................................21

          1.   The terms of use contain a binding and enforceable arbitration agreement. ...........................22

          2.   Mr. Walker gave his assent to the terms of use through his conduct. ....................................23

     B.   The district court erred when it concluded that Mr. Walker did not agree to be bound. ................................28

          1.   The text message Uber sent to Mr. Walker was clear and understandable. ...........................29

          2.   The district court's focus on a supposed "preview screen" was error............................32

     C.   The district court further erred when it denied Uber's request for reconsideration. ..................................35

II.  Mr. Walker's claims are subject to arbitration under traditional contract-law principles applicable to non-signatories. ..............................................40

     A.   Contract law permits requiring intended third-party beneficiaries to arbitrate disputes on the same terms as signatories...........................................40

     B.   Mr. Walker was bound to arbitrate as an intended third-party beneficiary...........................................44

Conclusion ..............................................51

Certificate of Compliance

Certificate of Service

Statutory Addendum

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdulwali* v. *WMATA*,
315 F.3d 302 (D.C. Cir. 2003) ............................................. 36

*Ali* v. *Federal Bureau of Prisons*,
552 U.S. 214 (2008) ............................................................. 48

*Aliron Int'l, Inc.* v. *Cherokee Nation Indus.*,
531 F.3d 863 (D.C. Cir. 2008) ........................................ 7, 20

*American Bureau of Shipping* v. *Tencara Shipyards S.P.A.*,
170 F.3d 349 (2d Cir. 1999) ............................................... 42

*American Exp. Co.* v. *Italian Colors Rest.*,
570 U.S. 228 (2013) ............................................................. 6

*Apprio, Inc.* v. *Zaccari*,
104 F.4th 897 (D.C. Cir. 2024) .......................................... 23

*Arthur Andersen LLP* v. *Carlisle*,
556 U.S. 624 (2009) ......................... 3, 19, 40, 41, 43, 44

*Bradley* v. *NCAA*,
249 F. Supp. 3d 149 (D.D.C. 2017) ................................... 43

*Camara* v. *Mastro's Rests. LLC*,
952 F.3d 372 (D.C. Cir. 2020) .................................... 7, 20, 24

*Carter* v. *Ralph Lauren Corp.*,
683 F. Supp. 3d 400 (S.D.N.Y. 2023) ................................ 31

*Charlton* v. *Mond*,
987 A.2d 436 (D.C. 2010) .................................................. 44

*Christian* v. *Uber Techs., Inc.*,
__ F. Supp. 3d __, 2025 WL 833130 (D.D.C. Mar. 17, 2025)............. 24

*Ciralsky* v. *CIA*,
355 F.3d 661 (D.C. Cir. 2004) ...................................... 36, 37

*City of New York ex rel. FDNY* v. *Henriquez*,
   98 F.4th 402 (2d Cir. 2024)................................................ 32

*Coastal Steel Corp.* v. *Tilghman Wheelabrator Ltd.*,
   709 F.2d 190 (3d Cir. 1983) ................................................ 42

*Cobell* v. *Jewell*,
   802 F.3d 12 (D.C. Cir. 2015) .................................. 20, 35, 36

*Coinbase, Inc.* v. *Bielski*,
   599 U.S. 736 (2023) .............................................................. 4

*Comer* v. *Micor, Inc.*,
   436 F.3d 1098 (9th Cir. 2006) .......................................... 41

*D.C. Transit Sys., Inc.* v. *United States*,
   717 F.2d 1438 (D.C. Cir. 1983) ........................................ 24

*Dhruva* v. *CuriosityStream, Inc.*,
   131 F.4th 146 (4th Cir. 2025) .......................................... 25

*Domer* v. *Menard, Inc.*,
   116 F.4th 686 (7th Cir. 2024) .......................................... 25

*Duffy* v. *Duffy*,
   881 A.2d 630 (D.C. 2005) .................................................. 23

*E.I. DuPont de Nemours & Co.*
   v. *Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
   269 F.3d 187 (3d Cir. 2001) .............................................. 42

*Edmundson* v. *Klarna*,
   85 F.4th 695 (2d Cir. 2023)............................................... 25

*EEOC* v. *Waffle House, Inc.*,
   534 U.S. 279 (2002)..................................................... 43, 44

*Emmanuel* v. *Handy Techs., Inc.*,
   992 F.3d 1 (1st Cir. 2021) ................................................. 25

*Epic Sys. Corp.* v. *Lewis*,
584 U.S. 497 (2018) .................................................. 6, 49

*Flynn* v. *Tiede-Zoeller, Inc.*,
412 F. Supp. 2d 46 (D.D.C. 2006) ........................................ 41

*Forrest* v. *Verizon Commc'ns, Inc.*,
805 A.2d 1007 (D.C. 2002) ............................................ 23, 28

*Fort Lincoln Civic Assoc., Inc.* v. *Fort Lincoln New Town Corp.*,
944 A.2d 1055 (D.C. 2008) ................................................ 44

*Foster* v. *Walmart, Inc.*,
15 F.4th 860 (8th Cir. 2021) ............................................. 25

*Gambo* v. *Lyft, Inc.*,
642 F. Supp. 3d 46 (D.D.C. 2022) .................................... 24, 25

*GE Energy Power Conversion France SAS, Corp.*
v. *Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020) ..................................................... 40

*Godun* v. *JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) ............................................ 31

*Greenberg* v. *Doctors Assocs., Inc.*,
338 F. Supp. 3d 1280 (S.D. Fla. 2018) .................................... 28

*Guttenberg* v. *Emery*,
41 F. Supp. 3d 61 (D.D.C. 2014) ..................................... 43, 44

*Hamilton* v. *Uber Techs., Inc.*,
No. 22-cv-06917, 2023 WL 5769500
(S.D.N.Y. Sept. 7, 2023) ........................................ 33, 48, 49

*Hartenstine* v. *Uber Techs., Inc.*,
753 F. Supp. 3d 1 (D.D.C. 2024) ......................... 41, 45, 47, 49

*Henry Schein, Inc.* v. *Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ....................................................... 6

*Hernandez* v. *Banks*,
65 A.3d 59 (D.C. 2013) ....................................................... 24, 31

*Hilbert* v. *Uber Techs., Inc.*,
No. 24-cv-584, 2025 WL 42725 (D.D.C. Jan. 7, 2025) ...... 24, 25, 28, 39

*Hossain* v. *JMU Props., LLC*,
147 A.3d 816 (D.C. 2016) ............................................... 44, 48

*Hughes* v. *Uber Techs., Inc.*,
718 F. Supp. 3d 571 (E.D. La. 2024) ................................... 49

*Industrial Elecs. Corp.* v. *iPower Distrib. Grp., Inc.*,
215 F.3d 677 (7th Cir. 2000) ............................................ 42

*InterGen N.V.* v. *Grina*,
344 F.3d 134 (1st Cir. 2003) ............................................ 42

*Jones* v. *Quintana*,
872 F. Supp. 2d 48 (D.D.C. 2012) ................................... 43, 44

*Kaminski* v. *Uber Techs., Inc.*,
No. 21STCV28483 (Cal. Super. Ct.,
Los Angeles Cty., Feb. 15, 2022) ...................................... 49

*Kearns & Lemos* v. *Uber Techs., Inc.*,
No. 22CV017881 (Cal. Super. Ct., Alameda Cty., June 14, 2023) ..... 49

*Leidos, Inc.* v. *Hellenic Republic*,
881 F.3d 213 (D.C. Cir. 2018) ......................................... 36

*Letizia* v. *Prudential Bache Secs., Inc.*,
802 F.2d 1185 (9th Cir. 1986) ......................................... 41

*Lustig* v. *Uber Techs., Inc.*,
21STCV39287 (Cal. Super. Ct., Los Angeles Cty., May 11, 2022) .... 49

*Maalouf* v. *Islamic Republic of Iran*,
923 F.3d 1095 (D.C. Cir. 2019) ....................................... 30, 32

*Macasero* v. *ENT Credit Union*,
533 P.3d 982 (Colo. Ct. App. 2023) ...................................... 28

*Mariano* v. *Gharai*,
999 F. Supp. 2d 167 (D.D.C. 2013) ...................................... 42

*MetroPCS Commc'ns, Inc.* v. *Porter*,
273 So.3d 1025 (Fla. 3d Dist. Ct. App. 2018) ..................................... 28

*Meyer* v. *Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ...................................... 25, 31, 33

*Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) .................................... 41

*Nguyen* v. *Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ............................ 25

*Oberstein* v. *Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ............................ 33

*Oehme, van Sweden & Assocs., Inc.* v. *Maypaul Trading & Servs. Ltd.*,
902 F. Supp. 2d 87 (D.D.C. 2012) ...................................... 41

*Osborn* v. *Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) ............................ 37

*Pyles* v. *HSBC Bank USA, N.A.*,
172 A.3d 903 (D.C. 2017) .................................... 34

*Quamina* v. *JustAnswer LLC*,
721 F. Supp. 3d 1026 (N.D. Cal. 2024) ....................... 31, 34

*Rent-A-Center, W., Inc.* v. *Jackson*,
561 U.S. 63 (2010) ............................................ 7

*Riley* v. *California*,
573 U.S. 373 (2014) ................................ 33

*Rodriguez* v. *Block, Inc.*,
No. 22-cv-372, 2023 WL 2854434 (W.D. Mich. Feb. 27, 2023) ........... 27

*Ruiz* v. *Millenium Square Residential Ass'n*,
466 F. Supp. 3d 162 (D.D.C. 2020) .................................................. 47

*Samuel* v. *Islam*,
224 N.Y.S.3d 57 (App. Div. 1st Dep't 2024) ................................... 50

*Selden* v. *Airbnb, Inc.*,
4 F.4th 148 (D.C. Cir. 2021) ........................................ 20, 24, 25, 30

*Silva* v. *Mpower Energy, LLC*,
No. 23-cv-9849, 2025 WL 934322 (S.D.N.Y. Mar. 27, 2025) ............. 27

*Smith* v. *Spizzirri*,
601 U.S. 472 (2024) ............................................................................ 7

*Starkey* v. *G Adventures, Inc.*,
796 F.3d 193 (2d Cir. 2015) ............................................................ 27

*Thomas* v. *Cricket Wireless, LLC*,
506 F. Supp. 3d 891 (N.D. Cal. 2020) ............................................. 32

*Thorne* v. *Square, Inc.*,
No. 20-cv-5119, 2022 WL 542383 (E.D.N.Y. Feb. 23, 2022) ............. 27

*Thoubboron* v. *Ford Motor Co.*,
809 A.2d 1204 (D.C. 2002) .............................................................. 43

*TIG Ins. Co.* v. *Republic of Argentina*,
110 F.4th 221 (D.C. Cir. 2024) ........................................................ 40

*Trans-Bay Eng'rs & Builders, Inc.* v. *Hills*,
551 F.2d 370 (D.C. Cir. 1976) .............................................. 42, 45, 47

*United States* v. *Abney*,
812 F.3d 1079 (D.C. Cir. 2016) ....................................................... 21

*Various Insurers* v. *Gen. Elec. Int'l, Inc.*,
131 F.4th 1273 (11th Cir. 2025) ...................................................... 42

*Western Union Tel. Co.* v. *Massman Constr. Co.*,
402 A.2d 1275 (D.C. 1979) .............................................................. 45

STATUTES

9 U.S.C. § 2 ................................................................. 6, 9, 22, 49

9 U.S.C. § 3 .................................................................... 6

9 U.S.C. § 16(a) ............................................................. 4

28 U.S.C. § 1332(a)(1) .................................................... 4

RULES

Fed. R. App. P. 4(a)(4) ................................................... 4

Fed. R. Civ. P. 54 ..................................................... 20, 35

Fed. R. Civ. P. 54(a) ...................................................... 35

Fed. R. Civ. P. 54(b) ............................................... 4, 19, 36

Fed. R. Civ. P. 58(a) ...................................................... 36

Fed. R. Civ. P. 59 .................................................... 35, 36

Fed. R. Civ. P. 59(e) ............................................... 4, 19, 20

OTHER AUTHORITIES

*Mobile Fact Sheet: Tech Adoption Trends*, PEW RSCH. CENTER (Nov. 13, 2024), https://www.pewresearch.org/internet/fact-sheet/mobile/ ...... 34

Restatement (Second) of Contracts § 19(2) ............................. 25

Williston on Contracts § 57:19 .......................................... 41

# GLOSSARY

| | |
|---|---|
| FAA | Federal Arbitration Act |
| Gaddis Decl. | Declaration of Todd Gaddis, R.9-2 (JA089–094) |
| JA__ | joint appendix at page __ |
| R.__ | district court docket entry __ |
| Terms | Uber's terms of use dated January 18, 2021, R.9-3 at 27–39 (JA121–133) |

## INTRODUCTION

The Nation's economy is now overwhelmingly service-based, and many consumer services naturally involve communicating with users through their phones. Some services are provided by digital applications on a smartphone. Companies often use phone calls or text messages to communicate details, times, and terms of use relating to their service. These consumer transactions are very often governed by contracts, which users frequently enter through their phones. Across the Nation, States agree through their contract law that, so long as users have reasonable notice of those contract terms, the terms are enforceable. It follows that a consumer cannot purposely seek the benefit of a company's service while choosing to be blind to the terms of use for the service, and thereby escape any obligations relating to the service. That is why hornbook contract law asks what a *reasonable* person would understand when presented with contract terms. The economy couldn't function otherwise.

Plaintiff Cheryl Walker has an account with Defendant Uber Technologies, Inc. She has used Uber's app and services for years. She has repeatedly and explicitly agreed to Uber's terms of use for its services. Those terms include a mutual, contractual promise that most disputes that might arise between Mrs. Walker and Uber relating to her use of Uber's services will be settled through binding arbitration, rather than in a court of law. Mrs. Walker has also used Uber's app to arrange rides for her husband, Plaintiff Carroll Walker, on multiple occasions. During

one of those trips, the car in which Carroll was riding collided with another vehicle. Carroll alleges that he was injured in the collision.

Notwithstanding the Walkers' contractual promise to arbitrate, they both sued Uber in district court. Uber moved to compel arbitration of Plaintiffs' claims. The district court agreed that Mrs. Walker had committed to arbitrate by agreeing to the terms of use. But the court denied the motion as to Mr. Walker. The court observed that Mr. Walker did not have his own Uber account. And it concluded that Uber had not adequately notified Mr. Walker of the arbitration agreement when it sent him a text message stating that, by taking the ride requested by his wife, he "agree[d] to the Uber Terms of Use" hyperlinked in the text message.

The district court's decision was incorrect. *First*, Mr. Walker accepted Uber's terms when Uber told him that taking the ride obtained through Uber's services would manifest his assent—and he did so. When Uber's services are used to arrange a ride for someone without their own Uber account, Uber sends them a text message to inform them of the timing and identity of the car they are awaiting. On six different occasions, Uber sent Mr. Walker a text message saying clearly that, if he took the ride, he would agree to Uber's terms of use. That message linked to the terms of use with a bright blue hyperlink. Mr. Walker took the ride, and so manifested his assent to the terms. While he argued below that he never reads text messages and chose to ignore Uber's, that is beside the point because the controlling inquiry notice test is objective, not sub-

jective. A *reasonable person* taking a ride arranged through Uber's services (and without his own account) would look at the text message. That message was Mr. Walker's way of identifying the driver and vehicle that would be picking him up. And that message made Mr. Walker aware of both Uber's terms of use and their manner of acceptance. The district court erred by misunderstanding the form of the message that Mr. Walker received from Uber. And when Uber tried to clear up the district court's misconceptions in a motion for reconsideration, the district court erroneously denied that motion and repeated its errors.

*Second* and independently, Mr. Walker is bound to arbitrate as an intended third-party beneficiary of the contract between Mrs. Walker and Uber—a contract that all agree exists and contains an arbitration provision. Mrs. Walker expressly contracted with Uber to arrange a ride for Mr. Walker, and his claims arise out of her use of Uber's services provided pursuant to that contract. The Supreme Court held in *Arthur Andersen LLP* v. *Carlisle*, 556 U.S. 624 (2009), that non-signatories may be compelled to arbitrate under traditional state-law contract principles like third-party beneficiary status. The district court erroneously rejected that framework, contrary to District of Columbia law.

The district court's approach is inconsistent with controlling federal law favoring the enforcement of arbitration agreements. This Court should reverse the order denying Uber's motion to compel arbitration of Mr. Walker's claims.

# JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are entirely diverse and the amount in controversy exceeds the jurisdictional minimum. The district court issued its order denying Uber's motion to compel arbitration as to Mr. Walker's claims on September 11, 2024. R.26 (JA312–330).[1] Appellants timely filed a notice of appeal on October 10, 2024. R.30. Appellants also moved for reconsideration pursuant to Rules 54(b), and alternatively 59(e), of the Federal Rules of Civil Procedure on October 9, 2024. R.27 (JA331–360). This Court held this appeal in abeyance pending reconsideration. R.30; Fed. R. App. P. 4(a)(4)(A). The district court later denied Uber's motion for reconsideration on February 14, 2025, R.35 (JA404–414), and amended its earlier opinion to include a separate judgment, R.36 (JA415–416). Uber timely amended its notice of appeal on March 6, 2025, to add the reconsideration order and judgment. R.38; Fed. R. App. P. 4(a)(4)(B)(ii).

This Court has appellate jurisdiction under 9 U.S.C. § 16(a) of the district court's refusal to compel arbitration. *See Coinbase, Inc.* v. *Bielski*, 599 U.S. 736, 739 (2023).

---

[1] "R.__" refers to docket item number before the district court. "JA__" refers to page of the joint appendix on appeal.

## ISSUE STATEMENT

1. A contract may be accepted through conduct if a person is on inquiry notice of the contract terms and the manner of their acceptance. When Mrs. Walker arranged a ride for Mr. Walker, Uber sent him a text message saying that taking the ride meant agreeing to Uber's terms of use and linking to them in bright blue. Mr. Walker then took the ride. The terms include an arbitration clause.

Is Mr. Walker obligated to arbitrate his claims against Uber because he agreed to Uber's terms of use? And in concluding otherwise, did the district court abuse its discretion by departing from the record made by the parties?

2. Under traditional contract-law principles, non-signatories to an arbitration agreement may be bound to it as intended third-party beneficiaries. Mrs. Walker arranged a ride for Mr. Walker pursuant to Uber's terms of use, which state that they cover rides and claims by third-party riders like spouses. Mr. Walker accepted the benefit of that contract by taking the ride, and his claims in litigation against Uber arise out of supposed duties created by that contract.

Is Mr. Walker obligated to arbitrate his claims against Uber as an intended third-party beneficiary of the contract between Uber and Mrs. Walker?

## PERTINENT STATUTES

Pertinent statutory provisions are in the accompanying Addendum.

## A.    Statutory Background

Congress enacted the Federal Arbitration Act (FAA) "in response to a perception that courts were unduly hostile to arbitration." *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 505 (2018). The FAA established a "liberal federal policy favoring arbitration agreements," recognizing "the promise of quicker, more informal, and often cheaper resolutions for everyone involved." *Id.* (citations omitted).

Under the FAA, an arbitration agreement is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Section 2 of the FAA "reflects the overarching principle that arbitration is a matter of contract," and "consistent with that text, courts must 'rigorously enforce' arbitration agreements according to their terms." *American Exp. Co.* v. *Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citations omitted). Parties may "agree to have an arbitrator decide … 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc.* v. *Archer & White Sales, Inc.*, 586 U.S. 63, 67–68 (2019) (citation omitted). Those contract provisions are frequently referred to as "delegation" clauses. *See, e.g.*, *Rent-A-Center, W., Inc.* v. *Jackson*, 561 U.S. 63, 68 (2010).

The FAA requires that a case be stayed pending arbitration if the issue involved is referable to arbitration. *See* 9 U.S.C. § 3. That stay is mandatory. *Smith* v. *Spizzirri*, 601 U.S. 472, 474 (2024).

A court considers a motion to compel arbitration as if it were a request for summary judgment on the issue of the formation of an arbitration agreement. *Aliron Int'l, Inc.* v. *Cherokee Nation Indus.*, 531 F.3d 863, 865 (D.C. Cir. 2008). That standard compels relief if there is "no genuine issue as to any material fact." *Camara* v. *Mastro's Rests. LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020) (citation omitted).

### B. Factual Background

#### 1. Uber's Rides platform and its terms of use

Uber is a technology company that uses proprietary software to develop and maintain multi-sided digital marketplaces. *See* JA090 ¶ 4 (Gaddis Decl.). On one side of the marketplace, businesses and individuals use Uber's platforms to connect with users and obtain payment-processing services. On the other side, users connect with and obtain various services from those businesses and individuals, such as rides, food, and retail products. One of the most well-known of these digital marketplaces, and the one relevant to this case, is the Uber Rides platform. *See* JA090 ¶ 4. The Uber Rides platform allows users seeking transportation to connect with independent drivers willing to provide rides for a fee. *Id.* A rider with an account can request rides for herself, or she can request guest rides on behalf of someone else—for example, to make it easier to pay for that person's ride. *See* JA092–094 ¶¶ 15–16, 19.

In order to use Uber's app-based services, a person must create an account and agree to Uber's contractual terms of use. JA090–092 ¶¶ 6–

7, 13. Like many businesses, Uber makes periodic changes to its terms of use and requires users to give their assent to the updated terms in order to maintain access to Uber's services.

When a user requests a ride through Uber on behalf of another person, the user must provide Uber with the guest rider's cellphone number. *See* JA092–093 ¶ 15; JA359 ¶ 8. Uber uses that information to send a text message providing the guest rider with essential information identifying the driver and vehicle that will pick up the guest rider. The text message also informs the guest rider that their use of Uber's services is subject to the terms of use; provides the guest rider with a copy of the terms of use; and informs the guest rider that accepting the ride constitutes assent to the terms of use.

Uber's terms of use effective January 18, 2021 (the "Terms") are relevant to this appeal. JA121–133 (Ex. C to Gaddis Decl.). The very first paragraph tells riders in all-caps to "PLEASE READ THESE TERMS CAREFULLY, AS THEY CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND UBER." JA122 (Terms § 1). The next explains that "[b]y accessing or using the Services," a rider "confirm[s] [their] agreement to be bound" by the Terms. *Id*. The Terms immediately explain in bold, all-caps text that they contain an arbitration agreement, and advise reviewing it carefully:

**IMPORTANT: PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND UBER CAN BE BROUGHT, INCLUDING THE ARBITRATION AGREEMENT (SEE SECTION 2 BELOW). PLEASE REVIEW THE ARBITRATION AGREEMENT BELOW CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION (AS DESCRIBED IN SECTION 2 BELOW). BY ENTERING INTO THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.**

*Id.* (formatting in original).

The next section spells out the arbitration agreement itself: "By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration, as set forth in this Arbitration Agreement." JA123 (Terms § 2). The Terms explain that they cover any dispute related to use of Uber's services, apart from some exceptions not relevant to this case:

> Except as expressly provided below … , you and Uber agree that any dispute, claim or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof, (ii) your access to or use of the Services at any time, (iii) incidents or accidents resulting in personal injury that you allege occurred in connection with your use of the Services, whether the dispute, claim or controversy occurred or accrued before or after the

date you agreed to the Terms, or (iv) your relationship with Uber, will be settled by binding arbitration between you and Uber, and not in a court of law.

*Id.* (Terms § 2(a)).

The Terms expressly cover claims by third-party beneficiaries to the contract between Uber and its users:

> This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third-parties, including but not limited to your spouses, heirs, third-party beneficiaries and assigns, where their underlying claims are in relation to your use of the Services. To the extent that any third-party beneficiary to this agreement brings claims against the Parties; those claims shall also be subject to this Arbitration Agreement.

*Id.*

### 2. Mrs. Walker agreed to Uber's terms of use and frequently used Uber's services.

Mrs. Walker used Uber's services hundreds of times before the ride at issue here. *See* JA165–175 (Ex. F to Gaddis Decl.); JA094 ¶ 20. She created her account around 2017, and agreed then to the terms of use. *See* JA090 ¶ 6; JA165; JA098 (Ex. B to Gaddis Decl.). She was later presented with messages in the Uber app informing her when the Terms were updated, asking her to read them, and requiring her to confirm her assent. JA091 ¶ 8. On February 12, 2021, Mrs. Walker checked a box confirming that she had "reviewed and agreed to" the updated Terms. JA091–092 ¶¶ 8–12; JA098.

### 3. Mr. Walker agreed to the terms of use by accepting guest rides arranged by Mrs. Walker.

Mrs. Walker also used her Uber account to arrange rides for her husband on multiple occasions. *See* JA094 ¶ 19; JA160–161. Mrs. Walker provided Uber with her husband's name and phone number at the time she requested the ride. JA093 ¶ 17. Each time, Mr. Walker received text messages to his phone notifying him of the forthcoming vehicle's details, a link to Uber's Terms, and a statement that his taking the ride meant agreeing to those terms. JA093 ¶ 17.

On March 18, 2021, Mrs. Walker once again used the Uber app to request a ride for Mr. Walker. JA094 ¶ 19; JA161; JA163; JA020 ¶ 91 (Complaint). Uber sent Mr. Walker a text message around 9 am letting him know that his ride would be arriving in 18 minutes and giving him the identity of the car and the driver's contact information. JA161. A few minutes later, the system sent him another text with an updated time, car, and driver. *Id.* At 9:23 am, Mr. Walker was sent a text letting him know his driver, George Ayari, was arriving. *Id.*

The text message told Mr. Walker the information he would need to make sure he got into the right car: its make and model, its license plate number, and the independent driver's name and phone number. *Id.* And right up front, Uber's text message explained that, "[b]y taking this trip, you agree to the Uber Terms of Use." *Id.* A blue hyperlink to those terms followed:

> Your Uber from Cheryl is arriving in 10 minutes.
> By taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl.
> Chevrolet Captiva
> 1EJ6584
> Driver George
> +12023018948
> Cheryl is paying for your trip.
> Track here: https://trip.uber.com/Wu8vBbIYEf3A
> Reply STOP to opt out from SMS notifications.

> Your Uber is arriving now.
> Chevrolet Captiva
> 1EJ6584
> Driver George
> +12023018948

JA356; JA093 ¶ 17; JA161.

Mr. Walker got into the back of Mr. Ayari's Chevy Captiva and began his ride. JA020 ¶ 92. During the trip, Ayari's vehicle was involved in a collision. JA024 ¶¶ 125–127.

## C. Proceedings Below

### 1. The Walkers asserted claims in federal court against Uber and the driver.

Notwithstanding the Walkers' contractual promise to arbitrate any disputes with Uber, Mrs. Walker sued Uber in district court, asserting one claim on her own behalf and all the other claims on behalf of her husband through power of attorney. JA008, JA029–049 ¶¶ 3–4, 147–241. Mrs. Walker also named the driver, Mr. Ayari, as a defendant, JA008,

JA027–028, JA048–049 ¶¶ 5, 142–146, 228–241, but she later dismissed all claims against him without prejudice, JA310; JA317 n.2. The lawsuit claims that Uber is at fault for Ayari's allegedly negligent driving, on theories of direct negligence and vicarious liability. JA051.

The complaint's allegations rely on Uber's communications to both of the Walkers, as customers, in connection with the ride that Mrs. Walker arranged for Mr. Walker using Uber's services. For example, the complaint alleges that both "Plaintiffs understood [the driver] to be an employee of Uber or at a minimum their agent," and that Defendants-Appellants "held out to the Plaintiffs" that he was so. JA020 ¶¶ 93–94. It alleges reliance by both "Plaintiffs" on Uber's communications surrounding that trip. JA029, JA032–033 ¶¶ 150, 160. It alleges that Defendants-Appellants breached duties to Mr. Walker by "failing to provide reasonable protection to Uber App users." JA036–037, JA039–040 ¶¶ 173, 181. It alleges that the defendants injured Mr. Walker because Uber "did not provide adequate warnings … to their customers." JA042 ¶ 198. And it alleges a "duty to … customers and consumers like the Plaintiffs" to design the Uber app safely. JA044–045 ¶ 213. In short, all the alleged damages arose out of supposed duties owed to Mr. Walker as a beneficiary of Uber's services. JA050–051 ¶¶ 242, 246–247.

## 2. The district court denied (in part) Uber's motion to compel arbitration.

After Plaintiffs served their complaint, Uber reached out to their counsel to request that they transfer the case to arbitration consistent with their obligations under the Terms. JA227–228 ¶¶ 2–6. The Walkers did not consent, JA228 ¶ 7, so Uber was forced to move to compel arbitration. JA053.

Uber's motion explained that Plaintiffs had agreed to arbitrate all their claims. JA063, JA075–087. Mrs. Walker was bound because she had manifested her assent to the Terms by checking a box confirming she had reviewed and agreed to the Terms. JA078. Those Terms included the arbitration agreement discussed above. JA084–085.

Mr. Walker had also manifested assent to the Terms. JA076–077. Uber cited the text message informing Mr. Walker of his driver's details, informing him that taking the trip meant agreeing to the Terms, and hyperlinking to the Terms. JA076. After receiving that text, Mr. Walker proceeded to take the ride. He had done so at least five other times before. JA077.

Uber also explained that Mr. Walker was bound under traditional contract principles as an intended third-party beneficiary of the agreement between Mrs. Walker and Uber. JA081–084. Uber explained that Mr. Walker had received a "direct benefit flowing from" Mrs. Walker's agreement with Uber: transportation. JA083 (emphasis omitted). His

claims arose out of this benefit. JA083. Uber explained that courts across the country had accordingly enforced Uber's arbitration agreement against third-party guest riders under similar circumstances. JA082.

The district court granted Uber's motion in part and compelled arbitration of Mrs. Walker's claim because she accepted the Terms and was bound by them. JA312, JA319–322. The district court rejected her argument that she "never read through" the Terms and was "not aware" of any waiver of trial by jury, JA320–321, because "a reasonable consumer reading the Terms would have inevitably discovered the arbitration clause," and Mrs. Walker was given an opportunity to read the Terms and was so "provided adequate notice of" the arbitration agreement. JA321 (cleaned up).

The district court denied Uber's motion, however, with respect to Mr. Walker's claims. JA312, JA318–319, JA322–330. The court first rejected Uber's argument that Mr. Walker had assented to the Terms by accepting a ride after being informed that doing so meant agreeing to them. JA322–327. The district court concluded that Uber's text message did not provide adequate notice because it was a "mishmash of words, symbols, letters, and numbers." JA325. In doing so, the district court quoted the *raw digital code* transmitting the message, which is how the message was logged in Uber's system but not how it appeared on Mr. Walker's (or any other user's) phone. *See* JA325. The court also reasoned that Mr. Walker would not have been on notice that the text message

contained a hyperlink because it posited that the "preview of a text message on a mobile device usually consists of only a few lines" and the hyperlink came later. JA326. No plaintiff had raised that theory.

The district court also rejected Uber's argument that Mr. Walker was bound to arbitrate as a third-party beneficiary. JA327–330. The court first concluded that District of Columbia law does not permit a party to enforce an arbitration provision against a non-signatory intended third-party beneficiary. JA328–329. But it also concluded that the wording of the Terms did not make Mr. Walker an intended third-party beneficiary. JA329–330.

### 3. The district court denied Uber's motion for reconsideration.

**a.** Uber moved for partial reconsideration of the district court's order. JA337–348. Uber explained that the district court's decision had relied on a new argument neither party made: that the text message was not in "plain English" but a "mishmash of words, symbols, letters, and numbers." JA338 (citing JA325–326). Because the Walkers did not raise that argument and the "actual appearance of the messages was not in dispute," Uber explained, it had no cause to address the issue previously. JA338–339, JA341–344. Uber sought to alleviate any possible confusion about how the message appeared by including a declaration from an Uber engineer. JA341–342; JA359 ¶¶ 10–11.

Plaintiffs opposed Uber's motion on other grounds, but they did not dispute how the message appeared. Nor, in fact, did they offer any evidence at all in rebuttal. No evidence, for instance, that Mr. Walker's phone displayed only truncated message previews. Plaintiffs instead argued that the court was not allowed to presume that Mr. Walker *received* the text message just because Uber sent it to him. JA375.

Uber's motion also argued that the district court had applied a legally incorrect actual-notice standard, rather than asking if an objective, reasonable person would have had notice of Uber's terms of use. JA345–347. In doing so, the district court had relied again on arguments that neither party had raised and that the record did not support—*i.e.*, that the hyperlink to the Terms would not have been visible on a hypothetical "preview" screen. JA346. Plaintiffs did not assert that a reasonable person would ignore all text messages, including those communicating the make and license plate of the car picking the person up. *See* JA379–383. Instead, Plaintiffs disputed merely that inquiry notice could ever suffice to form a valid contract. JA379–383.

**b.**   The district court denied Uber's motion for reconsideration. JA404. The court disagreed that it had misapprehended the evidence because the plain-English description of the text message in Uber's opening motion—which Plaintiffs did not dispute—had not appeared in an affidavit. JA408–409. The district court nevertheless held that, even considering the text message, Uber did not establish Mr. Walker's inquiry

notice because it failed to prove that a reasonable person would know how to read a text message. JA411–412. The district court again relied on its speculation that the "hyperlinked Terms" would not "have been visible to [Mr. Walker] on the text message preview screen on his mobile device." JA412. The court did not disagree with Uber's observation that its reasoning was not based on any argument or evidence in the record. Instead, the court described it as a "reality" "widely understood that text messages ordinarily first appear on smartphones as previews." JA413. The court reasoned that, because it was theoretically possible for Mr. Walker to use Uber's services without seeing the text message, the text message cannot provide inquiry notice. *Id.*

Uber timely appealed the denial of its motion to compel arbitration and the motion for partial reconsideration.

## SUMMARY OF ARGUMENT

**I.** Like most jurisdictions, the District of Columbia recognizes constructive notice (or "inquiry notice") of contract terms. The law also recognizes that assent to a contract may be given through actions.

Mr. Walker agreed to Uber's Terms—which include an arbitration agreement—when he boarded the ride that his wife requested for him. Before he entered the car, Uber sent him a text message that (i) identified the incoming driver and vehicle; (ii) stated in plain language that "By taking this trip, you agree to the Uber Terms of Use"; and (iii) supplied a

bright-blue, underlined hyperlink to those Terms. That was sufficient to put a reasonably prudent smartphone user on notice of the Terms and their manner of acceptance. Mr. Walker's choice to take the ride was an objective manifestation of assent.

The district court reached the opposite conclusion only by straying beyond the adversarial presentation of the issues. The court speculated that Mr. Walker's phone displayed raw SMS code rather than formatted, easy-to-understand English text, and that a hypothetical preview screen (absent from the record) had concealed the hyperlink. The court then compounded its error in denying Uber's Rule 54(b) motion for reconsideration, insisting on the heightened standards of Rule 59(e) even though no judgment had yet entered, and persisting in conclusions that the uncontroverted evidence disproved.

**II.** Independently, Mr. Walker is bound to arbitrate as an intended third-party beneficiary of his wife's agreement with Uber. In *Arthur Andersen*, the Supreme Court made clear that traditional principles of contract law (like the third-party beneficiary rule) may bind a person to an arbitration agreement even if he did not sign it. Mrs. Walker signed the Terms, which state that they apply to third-party claims in connection with the account-holder's use of Uber's services. Mrs. Walker directly named Mr. Walker as a third-party beneficiary when she added him to her account as a guest rider, used Uber's services to arrange a ride for him, and paid for his ride. Mr. Walker accepted that ride and deliber-

ately availed himself of Uber's services. His claims arise out of the agreement and Mrs. Walker's use of Uber's services, so he is bound to arbitrate.

The district court reached the opposite conclusion by making two errors. First, it concluded that District of Columbia law categorically forbids enforcing an arbitration agreement against a non-signatory. That is incorrect under settled D.C. precedent. Second, the district court erroneously ignored the undisputed facts showing that Mr. Walker was an intended third-party beneficiary of his wife's agreement.

Because Mr. Walker agreed to arbitrate, and because he is in all events an intended third-party beneficiary of his wife's arbitration agreement, this Court should reverse the decision below and compel Mr. Walker's claims to arbitration.

## STANDARD OF REVIEW

This Court reviews de novo an order on a motion to compel arbitration under the FAA. *Selden* v. *Airbnb, Inc.*, 4 F.4th 148, 155 (D.C. Cir. 2021). A court considers a request to compel arbitration under the summary judgment standard. *Aliron Int'l,* 531 F.3d at 865. A court must grant the motion if there is no genuine dispute of material fact with respect to formation of an arbitration agreement and the movant is entitled to judgment as a matter of law. *Camara*, 952 F.3d at 373.

This Court reviews the denial of reconsideration under Rule 59(e) or Rule 54 for abuse of discretion. *Cobell* v. *Jewell*, 802 F.3d 12, 23 (D.C. Cir. 2015).

**ARGUMENT**

The district court erred when it concluded that the Terms did not require Mr. Walker to arbitrate his claims against Uber. That conclusion was wrong for two reasons: *First*, Mr. Walker agreed to the arbitration provision after being put on inquiry notice that, by taking a ride, he would manifest his agreement to the Terms. *Second* and independently, Mr. Walker is bound to arbitrate as an intended third-party beneficiary who received the benefit of the contract and whose claims arise from it.

## I.   Mr. Walker's claims are subject to arbitration because he agreed to Uber's terms of use.

Mr. Walker agreed to arbitrate his claims because he availed himself of Uber's services with notice that doing so would confirm his agreement to Uber's terms of use for those services. The district court erred in concluding otherwise by mis-applying District of Columbia law validating inquiry notice. And even assuming that the court did not err in declining to compel arbitration of Mr. Walker's claims, the district court abused its discretion when it denied Uber's motion for reconsideration by applying the wrong legal framework and making conclusions not supported by the record.

### A.   Mr. Walker took a ride after being informed that doing so would manifest his agreement to Uber's hyperlinked terms of use.

The district court correctly recognized that the Terms contain an enforceable arbitration agreement, and that Mrs. Walker's alleged choice

not to read those Terms did not allow her to escape their application. But the court failed to carry those findings to their logical conclusion: Just as Mrs. Walker was on inquiry notice of those terms in signing up for Uber's app, Mr. Walker was on inquiry notice when he was texted the Terms and their manner of acceptance. He agreed to those terms when he took the ride.

### 1. The terms of use contain a binding and enforceable arbitration agreement.

The district court correctly held that Uber's January 2021 Terms, JA123–125, contain an arbitration agreement. JA315–316, JA319–320. That agreement covers all claims in this lawsuit. JA123 (Terms § 2). It extends to "any dispute, claim[,] or controversy in any way arising out of or relating to" the user's "use of the Services at any time" or "incidents or accidents resulting in personal injury that [the user] allege[s] occurred in connection with [his] use of the Services." *Id.* (Terms § 2(a)). It makes clear that those claims "will be settled by binding arbitration between you and Uber, and not in a court of law." *Id.* It explains: "You acknowledge and agree that you and Uber are each waiving the right to a trial by jury[.]" *Id.* It also explains that the arbitrator—not any court— will also decide whether or not a specific claim or issue falls within the scope of the arbitration agreement. JA124 (Terms § 2(c)).

A reasonable consumer reading the Terms "would have inevitably discovered" that arbitration clause, which means a person agreeing to the

Terms was "provided adequate notice." *Forrest* v. *Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010–1011 (D.C. 2002) (cleaned up). Whether or not the consumer elected to read the terms, he is bound so long as he had the *opportunity* to do so: "absent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Id.* at 1010 (citation omitted). The district court correctly applied those principles to Mrs. Walker and concluded that her assent to the Terms meant agreeing to arbitration. JA319–321. So if Mr. Walker agreed to Uber's Terms, then he likewise agreed to arbitrate this dispute.

### 2. Mr. Walker gave his assent to the terms of use through his conduct.

Mr. Walker accepted Uber's Terms by taking a ride after being informed by text message (i) that his specific driver and car were coming, (ii) that the ride was subject to Uber's hyperlinked terms of use, and (iii) that, by taking the ride, he agreed to those terms.

Under District of Columbia law, assent to a contract can be shown by "'actions of the parties.'" *Apprio, Inc.* v. *Zaccari*, 104 F.4th 897, 907 (D.C. Cir. 2024) (quoting *Duffy* v. *Duffy*, 881 A.2d 630, 636–637 (D.C. 2005)). A contract may be formed through conduct alone (without a signature) so long as the party to be bound "intend[ed] to engage in the conduct" and had "*reason to know* that the other party [would] infer from his conduct that he assent[ed]." *Camara*, 952 F.3d at 375 (emphasis added) (quoting Restatement (Second) of Contracts § 19(2)).

Conduct that objectively manifests an intent to be bound suffices to form a contract, whether or not a party later disclaims his *subjective* intent to agree. *See Hernandez* v. *Banks*, 65 A.3d 59, 70 (D.C. 2013) (a "meeting of the minds" does not require "actual mental assent"). So long as a party has inquiry notice of a contract's terms and the manner by which he may accept them—for example, by physically signing his name, digitally checking a box in a mobile app, or accepting the counterparty's performance—actual notice is not required. *See, e.g.*, *Selden*, 4 F.4th at 155–158 (this Court describing inquiry notice under California law); *Gambo* v. *Lyft, Inc.*, 642 F. Supp. 3d 46, 53–56 (D.D.C. 2022) (applying inquiry notice under D.C. law); *Christian* v. *Uber Techs., Inc.*, __ F. Supp. 3d __, 2025 WL 833130, at *4–5 (D.D.C. Mar. 17, 2025) (same); *Hilbert* v. *Uber Techs., Inc.*, No. 24-cv-584, 2025 WL 42725, at *3 (D.D.C. Jan. 7, 2025) (same, and collecting cases); *D.C. Transit Sys., Inc.* v. *United States*, 717 F.2d 1438, 1442 n.3 (D.C. Cir. 1983) (relying on "constructive notice" of lease agreement).

Similarly, federal courts assessing whether an arbitration agreement was formed for purposes of the FAA consistently apply the inquiry notice standard. *See, e.g.*, *Dhruva* v. *CuriosityStream, Inc.*, 131 F.4th 146, 152 (4th Cir. 2025); *Domer* v. *Menard, Inc.*, 116 F.4th 686, 695–697 (7th Cir. 2024); *Foster* v. *Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021); *Emmanuel* v. *Handy Techs., Inc.*, 992 F.3d 1, 7–8 (1st Cir. 2021); *Meyer*

v. *Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017); *Nguyen* v. *Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).

The inquiry notice test is an objective standard that asks whether "reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them." *Selden*, 4 F.4th at 156 (citation omitted); *see Gambo*, 642 F. Supp. 3d at 54 (inquiry notice should be assessed from the perspective of a "reasonably prudent smartphone user"); *Hilbert*, 2025 WL 42725, at *3 (enforcing reasonably conspicuous arbitration agreement against blind plaintiff who attested that he did not recall hearing the pop-up screen presenting the terms of use before clicking confirm). The test does not consider the subjective idiosyncrasies of the user. Rather, the law asks whether a reasonably prudent smartphone user—someone who is "not a complete stranger to computers or smartphones" and has "some familiarity with how to navigate to a website or download an app," but who is not a "highly savvy and sophisticated user … who spends all waking hours using some kind of technology"—would understand a digital user interface. *Edmundson* v. *Klarna*, 85 F.4th 695, 703–704 (2d Cir. 2023).

A reasonable person taking a trip under the circumstances here would have been on inquiry notice of the terms and their manner of acceptance. After his wife arranged a ride for him, Mr. Walker was sent a text message presenting the terms and their manner of acceptance.

JA093 ¶ 17. The message included an immediate, bright-blue hyperlink to Uber's January 2021 Terms:

> Your Uber from Cheryl is arriving in 10 minutes.
> By taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl.
> Chevrolet Captiva
> 1EJ6584
> Driver George
> +12023018948
> Cheryl is paying for your trip.
> Track here: https://trip.uber.com/Wu8vBbIYEf3A
> Reply STOP to opt out from SMS notifications.

> Your Uber is arriving now.
> Chevrolet Captiva
> 1EJ6584
> Driver George
> +12023018948

JA356; JA093 ¶ 17; JA161. Mr. Walker then took the trip.[2]

There is no genuine dispute that Mr. Walker was sent the message, that it conspicuously linked the terms and their manner of acceptance, or that he performed the action that he was told would manifest his assent: taking the trip. A reasonably prudent user would have opened and reviewed the text message in order to learn the license plate number,

---

[2] Mr. Walker also assented by conduct through the same user interface on five other occasions between October 2018 and March 2021. JA094 ¶ 19; JA163; JA160–161.

vehicle make, and model of the car picking him up—critical information that appeared *below* the hyperlink to the Terms.

For those reasons, courts across the country have repeatedly held that emails and text messages are sufficient to give rise to an enforceable contract. *See, e.g.*, *Starkey* v. *G Adventures, Inc.*, 796 F.3d 193, 195–197 (2d Cir. 2015) (tour company's booking information email, which contained a bold hyperlink to the terms and conditions and informed user that participation was subject to agreement to the terms, provided inquiry notice); *Silva* v. *Mpower Energy, LLC*, No. 23-cv-9849, 2025 WL 934322, at *7 (S.D.N.Y. Mar. 27, 2025) (circulation of terms and conditions "by email or text message" would "not preclude a finding" of inquiry notice); *Rodriguez* v. *Block, Inc.*, No. 22-cv-372, 2023 WL 2854434, at *7 (W.D. Mich. Feb. 27, 2023) (text message providing link to terms of service and conditioning use of services on agreement thereto sufficient for inquiry notice); *Thorne* v. *Square, Inc.*, No. 20-cv-5119, 2022 WL 542383, at *8, *11 (E.D.N.Y. Feb. 23, 2022) (text message stating "By entering, you agree to the Terms, E-Sign Consent, and Privacy Policy: [hyperlink]" put user "on inquiry notice of the existence of the" terms of use because it was "temporally coupled" to manifestation of assent through use of the services); *Greenberg* v. *Doctors Assocs., Inc.*, 338 F. Supp. 3d 1280, 1281, 1283 (S.D. Fla. 2018) (text message providing hyperlink to terms and conditions and stating "that by texting back or clicking 'sign me up' the participant agrees to the terms of use" sufficient for inquiry notice);

*MetroPCS Commc'ns, Inc.* v. *Porter*, 273 So.3d 1025, 1028–1029 (Fla. 3d Dist. Ct. App. 2018) (short monthly text messages informing users "that terms and conditions applied to use of the service" with a hyperlink to the terms was sufficient for inquiry notice); *see also Macasero* v. *ENT Credit Union*, 533 P.3d 982, 988–990 (Colo. Ct. App. 2023) (email provided inquiry notice to bank customer who had previously opted in to electronic communications instead of paper).

Thus, even though Mr. Walker denied (improbably) having read the text message, he is bound by the Terms because he "ha[d] an opportunity to read" them and has not alleged "fraud or mistake." *Forrest*, 805 A.2d at 1010 (citation omitted); *see also Hilbert*, 2025 WL 42725, at *3.

## B.    The district court erred when it concluded that Mr. Walker did not agree to be bound.

The district court concluded that Uber "failed to establish that Carroll would have been on notice that the text message contained a hyperlink to the Terms." JA326. The court based that conclusion on two unwarranted assumptions: First, that the text message appeared on Mr. Carroll's screen in the raw SMS Code preserved in Uber's logs and was not properly formatted by his device. And second, that only the portion of the message that would have appeared on a supposed "text message preview screen" is relevant to the inquiry notice analysis. Plaintiffs did not raise either argument below, and the record does not support either.

### 1. The text message Uber sent to Mr. Walker was clear and understandable.

The district court concluded that the Terms were not presented in a clear and conspicuous manner because the text message was "far from plain English." JA325–326. In doing so, the court assumed that the raw SMS code in Uber's log—a supposed "mishmash of words, symbols, letters, and numbers," with the link to the terms lurking inside—reflected how the text message appeared on Mr. Walker's device. JA325.

But Plaintiffs, who have Mr. Walker's device and can verify what messages appear on it, never made that argument. Everyone understood that the message appeared in plain English, with the hyperlink in blue and underlined. *See* JA064–065 (showing message in plain English, in "normal type," without newline \n symbols); JA076–077 (same); JA298 (same); JA250–255 (plaintiffs failing to dispute appearance of the text message). The district court even accepted that the hyperlink was "bright blue," "underlined," and "presented in a complete sentence"—even though this was not reflected on the face of the SMS code that the court otherwise relied upon. JA326. The district court nevertheless concluded that the messages must have appeared exactly as they appeared in Uber's raw technical logs. *See* JA161; JA093 ¶ 17. Because Plaintiffs never disputed Uber's evidence and argument regarding the appearance of the text message, the district court's embrace of this novel argument violated the party presentation principle. It is "basic to our adversary

system" that courts assume "the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Maalouf* v. *Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) (citations omitted).

The district court also faulted the text message for displaying "a four-word introductory clause" and "five additional words" before the hyperlink, and concluded that the text message therefore failed to "sufficiently draw[] a user's attention" to the Terms. JA326. But those words could not have been clearer in informing the recipient that his assent to the Terms would be inferred from conduct: "By taking this trip, you agree to the Uber Terms of Use & Privacy Policy." JA093 ¶ 17. That is no less conspicuous than the user interface that this Court found sufficient for inquiry notice in *Selden*. 4 F.4th at 156–157 (approving user interface that contained a red hyperlink to the contractual policies, set apart from plain text, and including a brief statement that signing-in meant agreeing to the terms).[3]

---

[3] Even if the district court's misunderstanding of the appearance of the text message were legally correct, the text message described at JA325–326 would still suffice for inquiry notice: "it contains a complete sentence and a bright blue hyperlink." *See Selden*, 4 F.4th at 157; *Meyer*, 868 F.3d at 77–78. Whether the other plain-text portions appeared as line breaks or symbols goes at most to "[a]esthetic judgments" that do not undercut the legal sufficiency of the message describing the method of assent and the bright blue hyperlink. *Selden*, 4 F.4th at 157.

The district court misapprehended three recent cases concerning contract formation via text message. JA326–327 (citing *Carter* v. *Ralph Lauren Corp.*, 683 F. Supp. 3d 400 (S.D.N.Y. 2023), *Thomas* v. *Cricket Wireless, LLC*, 506 F. Supp. 3d 891 (N.D. Cal. 2020), and *Quamina* v. *JustAnswer LLC*, 721 F. Supp. 3d 1026 (N.D. Cal. 2024), *aff'd sub nom. Godun* v. *JustAnswer LLC*, 135 F.4th 699 (9th Cir. 2025)). Contrary to the court's conclusion, these cases did not depend on whether the plaintiff clicked on the hyperlink or read the contract. That would be contrary to District of Columbia law. *E.g.*, *Hernandez*, 65 A.3d at 70.

In *Carter*, the court found that a text message did not give rise to a contract because the message gave no indication that the hyperlink led to an agreement. Anyone who received the message there—"We're updating our terms to give you more. Msg freq now varies. Save NOW with this 20% offer click here"—would assume that the link following "click here" was to a 20% off coupon, not a binding contract. 683 F. Supp. 3d at 414. Similarly in *JustAnswer*, the text message was sent *after* sign-up and payment as a "welcome" message that included a link to the terms of service as a courtesy. 721 F. Supp. 3d at 1034. It was thus insufficient for inquiry notice because it was "not temporally coupled with the relevant transaction (signing up for the trial)." *JustAnswer*, 135 F.4th at 714 n.7; *see also* 721 F. Supp. 3d at 1040 (finding the "contractual nature of the text messages was especially non-obvious" because a user "would not

expect to be sent, over text message, a contract governing an internet transaction that in her mind has already occurred").

On the other hand, the text message in *Thomas* provided inquiry notice because the text clearly stated that the hyperlink led to a contract, and the contract stated that "continued use and payment for [defendant's] services constituted acceptance" of the amended terms. 506 F. Supp. 3d at 898 ("See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at [hyperlink]."). The text message here provided even clearer and more conspicuous notice than in *Thomas* because the text message itself, and not just the hyperlinked agreement, expressly informed Mr. Walker that, by taking a trip obtained through Uber's services, he would manifest his assent to the Terms. JA093 ¶ 17; JA161.

### 2. The district court's focus on a supposed "preview screen" was error.

The district court also erred by resting its conclusion not on what the *message* showed but on whether or not an imagined *preview* of the message would have included the hyperlink. JA326–327. No case supported that new test, and no party made that argument. *See* JA250–255. The district court's violation of the party presentation principle alone warrants reversal here. *See, e.g.*, *Maalouf*, 923 F.3d at 1114–1115; *City of New York ex rel. FDNY* v. *Henriquez*, 98 F.4th 402, 416 (2d Cir. 2024)

(following party presentation principle to "decline to conduct [an] analysis that neither party has requested" (citation omitted)). Especially here, where the record does not include evidence regarding the type of mobile device that Mr. Walker used or how that device would have notified him regarding Uber's text message and its contents, this important motion should not have been decided on speculation.

The district court (JA326) referenced *Oberstein* v. *Live Nation Entertainment, Inc.*, 60 F.4th 505, 515 (9th Cir. 2023), but that case actually favors *Uber*. In *Oberstein*, the question was whether a website conspicuously presented contractual terms and their manner of acceptance. *Id.* at 515–516. The Ninth Circuit found that it did based on an analysis of the content of the page itself—not how a preview of the page might have appeared on a particular device. No other case cited by the district court uses the novel "text message preview" theory either.

For good reason. The inquiry notice standard is an objective test focused on the actions of a reasonable consumer, not the subjective idiosyncrasies of the plaintiff. Phones are now "a pervasive and insistent part of daily life." *Riley* v. *California*, 573 U.S. 373, 385 (2014). Most Americans have phones, use them for their intended purposes, and send and receive text messages. *See Meyer*, 868 F.3d at 77–78 ("[W]hen considering the perspective of a reasonable smartphone user, we need not presume

that the user has never before encountered an app or entered into a contract using a smartphone.").[4]

Mr. Walker's claimed personal practice of never reading text messages is thus legally irrelevant. A reasonable guest rider waiting for a ride that someone else arranged for him through Uber's service, where the information about the ride was provided by text message, would open and read a text message from Uber delivered while he waited for the driver to arrive. *Cf. JustAnswer*, 721 F. Supp. 3d 1026 (a consumer would be less likely to read a text message sent *after* the transaction had occurred). Even if the district court were correct that the proper object of the inquiry notice inquiry is a hypothesized "text message preview" rather than the entire text message, the text here began "Your Uber from Cheryl is arriving in 10 minutes." JA161; *see also* JA356; JA093 ¶ 17. That alone is enough to prompt a reasonably prudent smartphone user to continue reading in order to learn necessary information about the ride, such as the identity of the driver, car, and license plate number.

Even a preview of the text message would thus have provided a reasonable consumer "an *opportunity* to read" the terms on his phone. *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017) (emphasis

---

[4] More than 90% of American adults have a smartphone, and 98% have a phone of some kind. *Mobile Fact Sheet: Tech Adoption Trends*, Pew Rsch. Center (Nov. 13, 2024), https://www.pewresearch.org/internet/fact-sheet/mobile/.

added). "[W]hether he d[id] so or not" is immaterial to contract formation under D.C. law. *Id.* (citation omitted).

## C. The district court further erred when it denied Uber's request for reconsideration.

The district court also abused its discretion in rejecting Uber's request for reconsideration. JA408–409.

1. To start, the district court erred by concluding that Rule 59 (which governs reconsideration of judgments) applied instead of Rule 54 (which governs reconsiderations of interlocutory orders). *Cobell*, 802 F.3d at 25–26; JA404–406. The Rule 54 standard is "more flexible" in allowing "interlocutory presentation of new arguments as the case evolves." *Cobell*, 802 F.3d at 25; *accord* JA404–405 (district court recognizing this difference in the standard).

The district court reasoned that Rule 59 applied because (i) Rule 59 applies to a "motion to alter or amend a judgment"; (ii) denials of arbitration are immediately appealable; and (iii) Rule 54(a) defines a "judgment" to include "any order from which an appeal lies." JA405. But resort to Rule 59 was error because, "at the time the motion for reconsideration was filed, no judgment had yet been entered." *Cobell*, 802 F.3d at 25. The district court did not enter a separate judgment on its denial until later, when it denied reconsideration. *See* JA415. Rule 58(a) requires a judgment to be entered as a separate document apart from the order, and an appealable interlocutory order generally cannot be treated as a "judg-

ment" under Rule 59 until that happens. *See Abdulwali* v. *WMATA*, 315 F.3d 302, 304 (D.C. Cir. 2003). Although judgment was entered later, it was not entered "at the time the motion for reconsideration was filed," so "the reconsideration motion should have been treated as filed under Rule 54(b)." *Cobell*, 802 F.3d at 25.

    **2.**    In all events, even if the Rule 59 standard did apply, the district court was wrong to conclude that Uber failed to meet it. Uber explained that the court's reliance on facts and arguments outside the record resulted in clear error, and doing so without affording Uber an opportunity to respond would work a manifest injustice here. JA348. The district court's reliance in its denial order on arguments not raised by the parties and without affording Uber the chance to respond met the clear-error/manifest-injustice standard because it imposed "clear and certain prejudice" and was "fundamentally unfair." *Leidos, Inc.* v. *Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018).

    The district court incorrectly concluded that its original order committed no clear error that resulted in manifest injustice. JA408–409. It reasoned that "manifest injustice does not exist where … a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered." JA408 (citing *Ciralsky* v. *CIA*, 355 F.3d 661, 665 (D.C. Cir. 2004)). But Uber could have "avoided the outcome" only by predicting an argument—that text message *raw code* would be

seen and misunderstood by an average mobile phone user—that no party had raised and that had no basis in fact.

The district court also reasoned that it was proper to rely on the unformatted code in the raw SMS logs because that code text was quoted in Uber's proffered declaration. JA408–409. But that declaration confirms that the message did not appear on Mr. Walker's phone in the quoted raw SMS code; rather, it appeared with additional formatting, including for example, a "bright blue underlined hyperlink." JA093 ¶ 17. There was no dispute between the parties that the quoted \n symbols in the raw SMS code did not appear on Mr. Walker's phone. The accurate quotation in Uber's motion of the text message as it appeared on Mr. Walker's phone was thus entirely consistent with the supporting evidence. *See* JA093 ¶ 17; JA161.

**3.** The district court erroneously concluded in the alternative that the arguments and evidence in Uber's reconsideration motion were insufficient to show contract formation. JA410–414. This Court reviews that conclusion de novo because it is based on the merits. *Osborn* v. *Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).

The reconsideration motion put to rest any possible issue over whether the \n characters appeared in the text messages. They did not. JA356; JA359 ¶¶ 10–11. The only evidence in the record was that the messages would typically appear on a phone as submitted:

Your Uber from Cheryl is arriving in 10 minutes.
By taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl.
Chevrolet Captiva
1EJ6584
Driver George
+12023018948
Cheryl is paying for your trip.
Track here: https://trip.uber.com/Wu8vBbIYEf3A
Reply STOP to opt out from SMS notifications.

JA356. Uber's supplemental declarant explained, to remove any doubt, that the SMS logs contain "formatting instructions that the user would not see directly but are instead interpreted by the user's phone to format the message," such as "instructions for starting a new line of text." JA359 ¶ 10. Mr. Walker provided no evidence contradicting that sworn assertion, so there was no genuine dispute of material fact on the point.

The district court also erroneously applied a subjective notice test, rather than the objective inquiry notice test. JA411–412; *see* pp. 24–25, *supra*. The court relied on the fact that Mr. Walker "is not a typical Uber consumer" and that "he says he has never opened and read any message from Uber" because his "wife would verbally communicate all the ride

information to him." JA411. But Mr. Walker's idiosyncrasies have no bearing on how a "reasonably prudent smartphone user" would have understood Uber's text message. Uber provided evidence that it sends ride-notice details by text to third-party guest riders. *See* JA160–161; *see also* JA093 ¶ 16; JA359 ¶ 9 (Uber expressly contracts for right to directly communicate with third-party guest riders). The logical inference is that a reasonable guest rider *uses* that information, which is necessary for guest riders to identify the right car for that trip—otherwise, there would be no reason to incur the expense of all that messaging.

The court also erred by adhering to its novel "preview" legal test. JA413–414. The court acknowledged that the record lacks any evidence regarding "message previews," but concluded that it was "not required to blind itself to reality" and that "text messages ordinarily first appear on smartphones as previews." JA413. The court's assumption that Mr. Walker used a smartphone (and not a flip phone) is itself outside the record and does not necessarily reflect "reality." But even if it were proper for the court to rely on speculation derived from personal experience, mobile phones vary in how they notify users regarding incoming text messages. For all we know, Mr. Walker, like the plaintiff in *Hilbert*, had his phone set to read incoming text messages aloud. *See* 2025 WL 42725, at *3. In all events, it is common sense that reasonably prudent smartphone users will read the text messages that they are sent, especially if

they are waiting to learn the license plate number and description of the vehicle picking them up.

## II. Mr. Walker's claims are subject to arbitration under traditional contract-law principles applicable to non-signatories.

Independent of Mr. Walker's agreement to Uber's Terms through his actions, his claims are also subject to arbitration under traditional principles of contract law. Mr. Walker was an intended third-party beneficiary of Mrs. Walker's contract with Uber, and he availed himself of the benefit of that contractual arrangement. The district court erred as a matter of law on two grounds: First, in holding that non-signatories to an arbitration agreement cannot be bound to arbitrate in the District of Columbia. And second, in concluding that Mr. Walker was not an intended third-party beneficiary.

### A. Contract law permits requiring intended third-party beneficiaries to arbitrate disputes on the same terms as signatories.

1. This Court has observed that "many sources of law allow a contract to be enforced by or against nonparties to the contract." *TIG Ins. Co.* v. *Republic of Argentina*, 110 F.4th 221, 234 (D.C. Cir. 2024) (cleaned up). The Supreme Court confirmed in both *Arthur Andersen*, 556 U.S. at 631, and in *GE Energy Power Conversion France SAS, Corp.* v. *Outokumpu Stainless USA, LLC*, 590 U.S. 432, 437 (2020), that a non-signatory third-party beneficiary to an arbitration agreement may be

bound to arbitrate under traditional principles of contract and agency law if state law so allows. *See also* Williston on Contracts § 57:19 (explaining that "traditional principles of state law allow a contract to be enforced … against nonparties to the contract through … third party beneficiary theories," among others). That was the majority view of the courts of appeals even before *Arthur Andersen*, in view of the "strong federal policy favoring arbitration." *Letizia* v. *Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187–1188 (9th Cir. 1986) (citing *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)); *see Comer* v. *Micor, Inc.*, 436 F.3d 1098, 1104 n.10 (9th Cir. 2006) (describing recognitions by the First, Second, Fifth, Sixth, Seventh, and Eighth Circuits that "contract and agency principles continue to bind nonsignatories to arbitration agreements").

District of Columbia law permits binding a non-signatory to arbitrate under those traditional contract principles. In *Hartenstine* v. *Uber Technologies, Inc.*, 753 F. Supp. 3d 1 (D.D.C. 2024), the district court applied D.C. law under *Arthur Andersen* to bind a rideshare passenger to his father's arbitration agreement (as the person who had used his Uber app to obtain a ride), even though the son did not agree to its terms. *Id.* at 4–5. In *Flynn* v. *Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46 (D.D.C. 2006), the court applied D.C. law to compel an international union to arbitrate under the terms of a collective bargaining agreement between the defendant and one of the union's locals (to which the union itself was not a

party). *Id.* at 55. *See Oehme, van Sweden & Assocs., Inc.* v. *Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 100 (D.D.C. 2012) (recognizing that third-party beneficiaries could generally be compelled to arbitrate, though not on the facts there); *Mariano* v. *Gharai*, 999 F. Supp. 2d 167, 171–172 (D.D.C. 2013) (same).

D.C.'s approach is consistent with the general rule in other jurisdictions. *See, e.g.*, *Various Insurers* v. *Gen. Elec. Int'l, Inc.*, 131 F.4th 1273, 1277 (11th Cir. 2025) (compelling arbitration of claims by third-party beneficiary); *InterGen N.V.* v. *Grina*, 344 F.3d 134, 146 (1st Cir. 2003) ("[A] third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory."); *E.I. DuPont de Nemours & Co.* v. *Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001) (recognizing that third-party beneficiaries can be bound to arbitrate); *Industrial Elecs. Corp.* v. *iPower Distrib. Grp., Inc.*, 215 F.3d 677, 680 (7th Cir. 2000) ("As a third-party beneficiary, Industrial Electronics also would be bound by the arbitration provision."); *American Bureau of Shipping* v. *Tencara Shipyards S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."); *Coastal Steel Corp.* v. *Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202–204 (3d Cir. 1983) (enforcing forum-selection clause against non-signatory third-party beneficiary), *overruled on other grounds by Lauro Lines*

v. *Chasser*, 490 U.S. 496 (1989); *Trans-Bay Eng'rs & Builders, Inc.* v. *Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976) ("The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract.").

**2.** The district court committed legal error when it concluded that a non-signatory to an arbitration agreement categorically cannot be compelled to arbitrate. JA327–329. That is incorrect. The court relied on three cases for this proposition, none of which holds that D.C. law forbids enforcing an arbitration provision against an intended third-party beneficiary. JA328.

The district court first cited *Jones* v. *Quintana*, 872 F. Supp. 2d 48, 57 n.3 (D.D.C. 2012). But *Jones* relied on dicta in *EEOC* v. *Waffle House, Inc.*, 534 U.S. 279 (2002), a pre-*Arthur Andersen* case that questioned whether, under federal common law, a contract can bind a nonparty. *Id.* (citing 534 U.S. at 294). *Arthur Andersen* distinguished that portion of *Waffle House* as non-binding dicta. 556 U.S. at 631. The Supreme Court said clearly that "traditional principles of state law allow a contract to be enforced by or against nonparties," including through "third-party beneficiary theories." *Id.* (citation omitted)

The district court also cited *Bradley* v. *NCAA*, 249 F. Supp. 3d 149 (D.D.C. 2017), and *Guttenberg* v. *Emery*, 41 F. Supp. 3d 61 (D.D.C. 2014). But neither case concerns arbitration. The statement in *Bradley* that a contract party may not enforce a contractual promise against a third-party beneficiary, 249 F. Supp. 3d at 179, cannot be squared with long-

standing District of Columbia law on equitable estoppel. *E.g.*, *Thoubboron* v. *Ford Motor Co.*, 809 A.2d 1204, 1212–1213 (D.C. 2002). And *Guttenberg*, like *Jones*, improperly relied on the dicta in *Waffle House* that the *Arthur Andersen* Court distinguished. 41 F. Supp. 3d at 68. *Guttenberg* also cited *Charlton* v. *Mond*, 987 A.2d 436, 441 (D.C. 2010), for the *default rule* that "[n]on-parties owe no contractual duty to the contracting parties." But under longstanding principles of contract law, intended third-party beneficiaries are an *exception* that general rule.

### B. Mr. Walker was bound to arbitrate as an intended third-party beneficiary.

**1.** Mr. Walker was an intended third-party beneficiary of his wife's agreement with Uber. The contracting parties intended to directly benefit guest riders like Mr. Walker; Mrs. Walker requested and paid for a ride for Mr. Walker using Uber's services, which expressly offered the capability to arrange rides for guest riders; and Mr. Walker availed himself of the benefit of Uber's services. All of that occurred pursuant to the Terms of Use governing those services.

District of Columbia law assesses a person's status as an intended third-party beneficiary by considering not only the contract but also its circumstances. A person is an intended third-party beneficiary if "the contracting parties had an express or implied intention to benefit directly" that person. *Fort Lincoln Civic Assoc., Inc.* v. *Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008). "To be intended, a benefi-

ciary need not be named in the contract, as long as he … is ascertainable from the contract and the circumstances of the contract." *Hossain* v. *JMU Props., LLC*, 147 A.3d 816, 820 (D.C. 2016) (citation omitted); *see also Western Union Tel. Co.* v. *Massman Constr. Co.*, 402 A.2d 1275, 1277 (D.C. 1979). It is reasonable and proper to bind a party to an agreement if that party "accept[s] the benefits" of it. *Trans-Bay*, 551 F.2d at 378; *Hartenstine*, 753 F. Supp. 3d at 4–5.

Mrs. Walker requested a ride for Mr. Walker through the Uber Rides app. JA092–094 ¶¶ 14–15, 19; JA163; JA273 ¶ 1; JA020 ¶ 91. Using the interface that Uber developed and offered specifically for the purpose of arranging rides for guest riders, she entered Mr. Walker's name and phone number when requesting the trip. JA092–093 ¶ 15; JA163. When Mrs. Walker added Mr. Walker as a third-party rider, she was informed that he would receive direct communications from Uber. JA093 ¶ 17. And indeed, Mr. Walker received text messages from Uber. *Id.*; JA161. Mr. Walker voluntarily entered Mr. Ayari's Chevy Captiva, and he was its only passenger. JA020–021.

Mr. Walker could not have obtained that ride absent Mrs. Walker's agreement with Uber. Those Terms provide clearly that a person may not use Uber's app to match with a driver (for herself or for a third party) without agreeing to the Terms. JA122. Both Uber and Mrs. Walker intended that Mr. Walker would benefit from the Terms and from Uber's

ride-matching service. And Mr. Walker repeatedly accepted those benefits by knowingly taking rides arranged by his wife.

The conclusion that the Terms are intended to benefit guest riders like Mr. Walker is confirmed by the language and structure of the Terms. First, the arbitration agreement expressly extends to third-party beneficiaries, including spouses—which would be nonsensical if the Terms did not contemplate the provision of *benefits* to third parties. The Terms say that the arbitration agreement "shall include any claims brought by or against any third parties, including but not limited to your spouse[] … where their underlying claims are in relation to your use of the Services." JA123 (Terms § 2(a)). And they explain that, if "any third-party beneficiary to this agreement brings claims against the Parties[,] those claims shall also be subject to" arbitration. *Id.* Plaintiffs do not and cannot argue that their use of Uber's services to obtain rides for Mr. Walker was inconsistent with the Terms. To the contrary, the Terms include a special rule for minors: unlike adults like Mr. Walker, minors can be a guest rider under the Terms only if "they are accompanied by" the accountholder. JA116. That provision confirms that adults, unlike minors, *may* "receive transportation or logistics services from Third Party Providers" even when they are *not* "accompanied by" the accountholder. *Id.*

It is unsurprising, then, that Plaintiffs' complaint concedes that Mr. Walker's claims arise out of Uber's alleged contractual duties under the Terms. The complaint alleges, for example, that *both* "Plaintiffs under-

stood [the driver] to be an employee of Uber or at a minimum their agent" and Defendants-Appellants "held out to the Plaintiffs" that he was so. JA020 ¶¶ 93–94. It alleges reliance by *both* "Plaintiffs" on Uber's communications about that trip. JA029, JA032–033 ¶¶ 150, 160. It alleges that Defendants-Appellants "did not provide adequate warnings … to their customers." JA042 ¶ 198. And it alleges a "duty to … customers and consumers like [both of] the Plaintiffs." JA044–045 ¶ 213. Mr. Walker cannot be heard to claim that Uber owed him duties under the Terms while disclaiming his reciprocal duties as a third-party beneficiary of that same agreement. *See Trans-Bay*, 551 F.2d at 378 ("The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract.").

Thus, as a matter of D.C. law, both the language of the contract and the broader context show that Mr. Walker was an intended third-party beneficiary of the agreement between Mrs. Walker and Uber, and therefore may be compelled to arbitrate his claim against Uber that arises specifically from his knowing acceptance of a benefit under that same contract. *See, e.g.*, *Ruiz* v. *Millenium Square Residential Ass'n*, 466 F. Supp. 3d 162, 173–174 (D.D.C. 2020) (applying D.C. law and compelling arbitration despite lack of contractual privity where claims, including negligence count, were "intertwined" with agreement); *Hartenstine*, 753 F. Supp. 3d at 5 ("Petitioner accepted the benefits of his father's contract with Respondent by entering … the Uber that his father ordered, regardless of whether he physically clicked 'accept' on the Mexican Terms.").

**2.** The district court incorrectly concluded that Mr. Walker was not an intended third-party beneficiary of the contract between Mrs. Walker and Uber. JA329–330. The court reached that conclusion by failing to apply the correct legal standard—which considers not only "the contract" but also "the circumstances of the contract." *Hossain*, 147 A.3d at 820.

The court erroneously focused only on Mrs. Walker's account creation, not her contracting for a specific ride for Mr. Walker. JA329. But the latter action was an indispensable part of the circumstances that led to Mr. Walker's acceptance of a benefit under the Terms. The court cited the language of the Terms alone and said that the language did not *expressly mention* as one of the covered "Services" "the ability of a user to order rides for others." JA329. But it is undisputed that Uber's platform allows arranging guest rides for others, and the Terms made clear that the Services were the "use" of the Uber platform "and *any* related content or services." JA122 (Terms § 1). The Terms further made clear that "*any* dispute, claim or controversy *in any way* arising out of or relating to" Mrs. Walker's "access to or use of the Services at any time" was subject to arbitration. JA123 (Terms § 2(a)) (emphasis added). *See Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[R]ead naturally, the word 'any' has an expansive meaning[.]" (citation omitted)).

The district court also erroneously reasoned that the language in the arbitration provisions expressly directed to "spouses" was insufficient

because "that provision [was] not intended to benefit *Carroll*; it benefits only *Uber*." JA329. That conclusion was wrong two ways. First, the district court adopted an incorrectly narrow view of whether the arbitration agreement itself directly benefited Mr. Walker, as opposed to the agreement as a whole—through which Mr. Walker benefitted by being able to take rides arranged by his wife. And second, the district court was wrong to conclude that this *bilateral* arbitration provision is beneficial only to Uber. The agreement provides for arbitration of all claims *by or against* third-party beneficiaries like Mr. Walker, and allows *both* users and Uber to demand arbitration. *See* JA123–124 (Terms § 2) ("[Y]ou and Uber are each waiving the right to a trial by jury …"; "[Y]ou and Uber each agree to notify the other party in writing of any dispute …"). Mr. Walker will benefit from arbitration because it is "quicker, more informal, and often cheaper … for everyone involved" than litigation. *Epic Systems*, 584 U.S. at 505.

The district court's decision was an outlier. Other courts have routinely enforced Uber's arbitration agreement with respect to guest riders under traditional contract principles. *See, e.g.*, *Hamilton* v. *Uber Techs., Inc.*, No. 22-cv-06917, 2023 WL 5769500, at *4–5 (S.D.N.Y. Sept. 7, 2023) (compelling guest rider whose claims "ar[o]se out of" and "relate[d] to" signatory's use of services to arbitrate as a third-party beneficiary, even though guest did not actually know about terms); *Hartenstine*, 753 F. Supp. 3d at 5–6 (applying to claims of son whose father arranged ride);

*Kearns & Lemos* v. *Uber Techs., Inc.*, No. 22CV017881 (Cal. Super. Ct., Alameda Cty., June 14, 2023); *Hughes* v. *Uber Techs., Inc.*, 718 F. Supp. 3d 571, 584 (E.D. La. 2024) (compelling guest rider whose claims "ar[o]se out of or relate[d] to" use of Uber's services); *Kaminski* v. *Uber Techs., Inc.*, No. 21STCV28483 (Cal. Super. Ct., Los Angeles Cty., Feb. 15, 2022); *Lustig* v. *Uber Techs., Inc.*, 21STCV39287 (Cal. Super. Ct., Los Angeles Cty., May 11, 2022); *Samuel* v. *Islam*, 224 N.Y.S.3d 57, 58–59 (App. Div. 1st Dep't 2024) (compelling arbitration of claims brought by "a passenger in a car requested by his friend through her account with Lyft"). There was no reason to discard that consensus here.

\*　　\*　　\*

At bottom, Mr. Walker's personal-injury claims in this action originate from, and depend on, the contractual relationship between Uber, Mrs. Walker, and him. He pleads that Uber owed him a duty, but if any such duty existed, it arose because of that contractual relationship. Under traditional contract principles, Uber is entitled to compel arbitration under an agreement where the underlying claims it is defending arise out of that agreement, and where the third-party beneficiary (Mr. Walker) intentionally stood to benefit from that agreement's terms. Uber is therefore entitled to assert any defenses or procedural options arising under that relationship—including arbitration.

## CONCLUSION

This Court should reverse the district court's denial of Uber's motion to compel arbitration of Mr. Walker's claim.

Dated: June 25, 2025

Respectfully submitted,

Jacob Taber
PERKINS COIE LLP
1155 Sixth Avenue, 22nd Floor
New York, NY 10036

Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street, N.W.,
Suite 800
Washington, D.C. 20005-3960

*/s/ Michael R. Huston*
Michael R. Huston
PERKINS COIE LLP
2525 East Camelback Road,
Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
MHuston@perkinscoie.com

*Attorneys for Uber Technologies, Inc.,
Rasier, LLC, and Rasier-DC, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. As measured by the word-processing system used to prepare this brief, the brief contains **12,126** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and complies with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a 14-point proportionally spaced roman-style typeface (Century Schoolbook).

Date: June 25, 2025

*/s/ Michael R. Huston*
Michael R. Huston

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: June 25, 2025

*/s/ Michael R. Huston*
Michael R. Huston

# STATUTORY ADDENDUM

**ADDENDUM**

**TABLE OF CONTENTS**

**Page**

9 U.S.C. § 2 ................................................................. Add. 1

9 U.S.C. § 3 ................................................................. Add. 2

9 U.S.C. § 4 ................................................................. Add. 3

9 U.S.C. § 16 ............................................................... Add. 5

## 9 U.S.C. § 2. Validity, irrevocability, and enforcement of agreements to arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

**9 U.S.C. § 3. Stay of proceedings where issue therein referable to arbitration**

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

**9 U.S.C. § 4. Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination**

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue.

Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

**9 U.S.C. § 16. Appeals**

(a) An appeal may be taken from—

(1) an order—

(A) refusing a stay of any action under section 3 of this title,

(B) denying a petition under section 4 of this title to order arbitration to proceed,

(C) denying an application under section 206 of this title to compel arbitration,

(D) confirming or denying confirmation of an award or partial award, or

(E) modifying, correcting, or vacating an award;

(2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

(3) a final decision with respect to an arbitration that is subject to this title.

(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—

(1) granting a stay of any action under section 3 of this title;

(2) directing arbitration to proceed under section 4 of this title;

(3) compelling arbitration under section 206 of this title; or

(4) refusing to enjoin an arbitration that is subject to this title.