# In the United States Court of Appeals
# For the District of Columbia Circuit

CHERYL WALKER,

*Plaintiff-Appellee,*

v.

UBER TECHNOLOGIES INC., et al.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Columbia
Case No. 1:23-cv-03976
Hon. Amit P. Mehta, U.S. District Judge

## PLAINTIFF-APPELLEE'S ANSWERING BRIEF

David E. Haynes
THE COCHRAN FIRM, D.C.,
PLLC
1666 K St. NW, Ste. 1150
Washington, DC 20006
(202) 682-5800
dhaynes@cochranfirmdc.com

Shelby Leighton
Lucia Goin
Leah M. Nicholls
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
sleighton@publicjustice.net

*Counsel for Plaintiff-Appellee*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1) and the Clerk's Order dated February 20, 2025, counsel for Appellees certify as follows:

1.  **Parties and Amici**

    a.  **Appellee**: Cheryl Walker, as power of attorney for Carroll Walker;

    b.  **Appellants:** Uber Technologies, Inc., Rasier, LLC, and Rasier-DC, LLC;

    c.  **Amici:** None.

2.  **Rulings under Review:**

    a.  Order of the U.S. District Court for the District of Columbia entered on September 11, 2024 (Dkt. 26, JA312), denying Uber's Motion to Compel Arbitation as to Plainitff Carroll Walker's Claims (as amended February 14, 2025 (Dkt. 36, JA415), and

    b.  Order of the U.S. District Court for the District of Columbia entered February 14, 2025 (Dkt. 35, JA404), denying Uber's Motion for Reconsideration of the

Court's denial in part Uber's Motion to Compel Arbitration.

3.    **Related Cases:** The case on review has never been before this Court. Counsel is not aware of any related cases currently pending in any other court.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases.............................i

Table of Authorities.................................................................v

Glossary .............................................................................xi

Introduction .........................................................................1

Statement of the Issues...........................................................2

Statement of the Case ...........................................................2

    I.    Factual Background ...............................................2

    II.   Procedural History ...............................................4

        A.    Cheryl and Carroll Sue Uber for Causing Carroll's Injuries. ................................................4

        B.    Though Carroll Doesn't Have an Uber Account, Uber Attempts to Compel Arbitration of Carroll's and Cheryl's Claims. ................................................5

        C.    The District Court Denies Uber's Motion as to Carroll's Claims and Denies Uber's Motion for Reconsideration.8

Standard of Review ..............................................................11

Summary of the Argument ..................................................12

Argument...........................................................................15

    I.    The Federal Arbitration Act Requires Courts to Treat Arbitration Agreements Like All Other Contracts. .............15

    II.   The District Court Correctly Held that It Was Uber's Burden to Prove that an Agreement to Arbitrate Was Formed, and It Failed to Do So. ................................................16

A.     Uber Did Not Prove Carroll Had Notice of an Offer to Contract. .................................................................. 17

B.     Even if Carroll Read Uber's Text Message, Uber Did Not Prove that the Message Provided Him with Conspicuous Notice of the Terms. ............................ 29

C.     Uber Failed to Prove that Carroll Assented to its Terms by Taking the Uber Ride. ................................ 36

D.     The District Court Did Not Abuse its Discretion in Denying Uber's Motion for Reconsideration. ............. 37

III.     The District Court Correctly Held that Uber Cannot Enforce its Agreement with Cheryl Against Carroll as a Third-Party Beneficiary .......................................................................... 42

A.     D.C. Law Does Not Permit Uber to Enforce its Terms *Against* a Third-Party Beneficiary. ........................... 43

B.     Uber Conflates Third-Party Beneficiary Doctrine with Equitable Estoppel, which it Has Forfeited. .............. 47

C.     Carroll Is Not an Intended Beneficiary of the Terms, Nor Did He Seek to Benefit from Them. ..................... 50

Conclusion ............................................................................ 60

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Abdulwali v. WMATA*,
   315 F.3d 302 (D.C. Cir. 2003) ......................................... 38, 39

*Apprio, Inc. v. Zaccari*,
   104 F.4th 897 (D.C. Cir. 2024)...................................... 17, 47

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009)............................................. 43, 46, 47

*Bank of Am., N.A. v. D.C.*,
   80 A.3d 650 (D.C. 2013) ....................................................... 15

*Bazemore v. Jefferson Cap. Sys., LLC*,
   827 F.3d 1325 (11th Cir. 2016)........................................... 30

*Bean v. Perdue*,
   316 F. Supp. 3d 220 (D.D.C. 2018) .................................... 26

\* *Bradley v. Nat'l Collegiate Athletic Ass'n*,
   249 F. Supp. 3d 149 (D.D.C. 2017) .................................... 44

\* *Camara v. Mastro's Rests. LLC*,
   952 F.3d 372 (D.C. Cir. 2020) ......................... 11, 17, 29, 36

*Carter v. Ralph Lauren Corp.*,
   683 F. Supp. 3d 400 (S.D.N.Y. 2023)............................. 30, 33

*Cassidy v. Owens*,
   533 A.2d 253 (D.C. 1987) ................................................... 59

*Charlton v. Mond*,
   987 A.2d 436 (D.C. 2010) .............................................. 43, 44

*Christian v. Uber Techs., Inc.*,
   775 F. Supp. 3d 272. (D.D.C. Mar. 17, 2025) .................... 21

\* Authorities upon which we chiefly rely are marked with asterisks.

*Ciralsky v. CIA,*
    355 F.3d 661 (D.C. Cir. 2004) ............................................................. 39

*Clay Props., Inc. v. Washington Post Co.,*
    604 A.2d 890 (D.C. 1992) ................................................................. 19

*Cobell v. Jewell,*
    802 F.3d 12 (D.C. Cir. 2015) ........................................................ 12, 39

*Cullinane v. Uber Techs., Inc.,*
    893 F.3d 53 (1st Cir. 2018) ......................................................... 31, 34

*Davis v. D.C. Child and Family Serv. Agency,*
    2014 WL 12802261 (D.D.C. Oct. 20, 2014) ........................................ 42

*EEOC v. Waffle House, Inc.,*
    534 U.S. 279 (2002) .................................................................. 44, 46

*Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.,*
    153 F. Supp. 3d 338 (D.D.C. 2016) ................................................... 57

*In re Estate of Fulton,*
    287 A.3d 253 (D.C. 2023) ............................................................... 26

*Flynn v. Tiede-Zoeller, Inc.,*
    412 F. Supp. 2d 46 (D.D.C. 2006) .................................................... 49

*Fort Lincoln Civic Ass'n. v. Fort Lincoln New Town Corp.,*
    944 A.2d 1055 (D.C. 2008) ......................................................... 43, 53

*Freitas v. Cricket Wireless, LLC,*
    2022 WL 1082014 (N.D. Cal. Apr. 11, 2022) ..................................... 23

*Estate ex rel. Gaither v. District of Columbia,*
    771 F. Supp. 2d 5 (D.D.C. 2011) ..................................................... 42

*Gambo v. Lyft,*
    642 F. Supp. 3d 46 (D.D.C. 2024) .................................................... 21

*Gen. Ass'n of Regular Baptist Churches v. Scott,*
    549 F. App'x 531 (7th Cir. 2013) ..................................................... 37

*Greenberg v. Drs. Assocs., Inc.*,
 338 F. Supp. 3d 1280 (S.D. Fla. 2018) ................................................ 26

*Guam Indus. Servs., Inc. v. Rumsfeld*,
 441 F. Supp. 2d 21 (D.D.C. 2006) ......................................... 44, 51, 54

*Guinn Co. v. Mazza*,
 296 F.2d 441 (D.C. Cir. 1961) ............................................................ 53

\* *Guttenberg v. Emery*,
 41 F. Supp. 3d 61 (D.D.C. 2014) ........................................... 44, 45, 46

*Hamilton v. Uber Techs, Inc.*,
 2023 WL 5769500 (S.D.N.Y. Sept. 7, 2023) ...................................... 55

*Hartenstine v. Uber Technologies, Inc.*,
 753 F. Supp. 3d 1 (D.D.C. 2024) .................................................. 48, 49

*Hilbert v. Uber Techs., Inc.*,
 2025 WL 42725 (D.D.C. Jan. 7, 2025) ............................................... 21

*Hines v. Overstock.com, Inc.*,
 668 F. Supp. 2d 362 (E.D.N.Y. 2009 (2d Cir. 2010) .......................... 33

*Hughes v. Uber Techs., Inc.*,
 718 F. Supp. 3d 571 (E.D. La. 2024) .................................................. 55

*Jack Baker, Inc. v. Off. Space Dev. Corp.*,
 664 A.2d 1236 (D.C. 1995) ................................................................. 45

*Jacks v. CMH Homes, Inc.*,
 856 F.3d 1301 (10th Cir. 2017) .................................................... 58, 60

*Jahanbein v. The Ndidi Condo. Unit Owners Ass'n, Inc.*,
 85 A.3d 824 (D.C. 2014) ..................................................................... 44

*Jones Lang LaSalle Americas, Inc. v. NLRB*,
 128 F.4th 1288 (D.C. Cir. 2025) ......................................................... 47

\* *Jones v. Quintana*,
 872 F. Supp. 2d 48 (D.D.C. 2012) ................................................ 44, 45

*Kauders v. Uber Techs, Inc.*,
    159 N.E.3d 1033 (Mass. 2021) .................................... 28, 36

*Keymer v. Mgmt. Recruiters Int'l, Inc.*,
    169 F.3d 501 (8th Cir. 1999) ............................................ 11

*Knutson v. Sirius XM Radio, Inc.*,
    771 F.3d 559 (9th Cir. 2014) ........................................... 11

*Loc. Union No. 898 Of Int'l Bhd. of Elec. Workers v. XL Elec., Inc.*,
    380 F.3d 868 (5th Cir. 2004) ........................................... 12

*Macasero v. ENT Credit Union*,
    533 P.3d 982 (Colo. App. 2023) ....................................... 27

*Mariano v. Gharai*,
    999 F. Supp. 2d 167 (D.D.C. 2013) .................................. 46

*Marie v. Allied Home Mortg. Corp.*,
    402 F.3d 1 (1st Cir. 2005) .............................................. 37

*Marshall v. Georgetown Mem'l Hosp.*,
    112 F.4th 211 (4th Cir. 2024) ......................................... 36

*MetroPCS Commc'ns, Inc. v. Porter*,
    273 So. 3d 1025 (Fla. Dist. Ct. App. 2018) ....................... 27

*Morales-Posada v. Cultural Care, Inc.*,
    141 F.4th 301 (1st Cir. 2025) .......................................... 51

* *Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022) ........................................... 15, 45, 59

*Multi-Fin. Sec. Corp. v. King*,
    386 F.3d 1364 (11th Cir. 2004) ....................................... 11

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) .................................... 22, 24

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*,
    298 F. Supp. 2d 81 (D.D.C. 2004) ................................... 53

*Oehme, van Sweden & Assocs. v. Maypaul Trading & Servs. Ltd.*,
  902 F. Supp. 2d 87 (D.D.C. 2014) ........................................... 46, 57, 59

*Osvatics v. Lyft, Inc.*,
  535 F. Supp. 3d 1 (D.D.C. 2021) ................................................ 17

*Outlaw v. Airtech Air Conditioning & Heating, Inc.*,
  412 F.3d 156 (D.C. Cir. 2005) .................................................. 51

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967) ............................................................... 15

*Rodriguez v. Block, Inc.*,
  2023 WL 2854434 (W.D. Mich. Feb. 27, 2023) ................................. 27

*Sarchi v. Uber Techs., Inc.*,
  268 A.3d 258 (Me. 2022) ......................................................... 22

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) .................................................. 18, 19, 21

\* *Selden v. Airbnb, Inc.*,
  4 F.4th 148 (D.C. Cir. 2021) ............... 11, 18, 20, 22, 29, 31, 32, 34, 40

*Sexton v. Xerox Corp.*,
  2024 WL 4201186 (D. Haw. Sept. 16, 2024) .................................... 19

*Silva v. Mpower Energy, LLC*,
  2025 WL 934322 (S.D.N.Y. Mar. 27, 2025) ..................................... 26

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ...................................................... 33

*Starkey v. G Adventures, Inc.*,
  796 F.3d 193 (2d Cir. 2015) ..................................................... 26

*Thorne v. Square, Inc.*,
  2022 WL 542383 (E.D.N.Y. Feb. 23, 2022) ..................................... 27

*Thoubboron v. Ford Motor Co.*,
  809 A.2d 1204 (D.C. 2002) ....................................................... 48

*Towns v. W. Creek Fin., Inc.*,
   2023 WL 7490007 (E.D. Cal. Nov. 13, 2023) ...................................... 23

*Trans-Bay Eng'rs & Builders, Inc. v. Hills*,
   551 F.2d 370 (D.C. Cir. 1976) ...................................................... 49, 50

*Univ. of the D.C. Fac. Ass'n v. Bd. of Trustees of Univ. of the
   D.C.*,
   257 A.3d 1026 (D.C. 2021) ................................................................ 16

*Usme v. CMI Leisure Mgmt, Inc.*,
   106 F.4th 1079 (11th Cir. 2024) ...................................................... 59

*Viking River Cruises, Inc. v. Moriana*,
   596 U.S. 639 (2022) ............................................................................ 16

*W. Union Tel. Co. v. Massman Const. Co.*,
   402 A.2d 1275 (D.C. 1979) .......................................................... 51, 52

*Wilson v. Redbox Automated Retail, LLC*,
   448 F. Supp. 3d 873 (N.D. Ill. 2020) .............................................. 23

*In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*,
   893 F. Supp. 2d 1058 (D. Nev. 2012) .......................................... 24, 25

## Statutes and Rules

9 U.S.C. § 16 ....................................................................................... 9, 37

Federal Rule of Civil Procedure 54 ..................................... 12, 37, 38, 42

Federal Rule of Civil Procedure 59 .................... 10, 12, 13, 37, 39, 41, 42

## Treatises

Restatement (Second) of Contracts (1981) .......................... 36, 51, 54, 57

Williston on Contracts (4th ed.) ............................................... 17, 18, 52

# GLOSSARY

Dkt.                    District Court Docket Entry

FAA                     Federal Arbitration Act

JA                      Joint Appendix

# INTRODUCTION

Carroll Walker was severely and permanently injured when the Uber app directed the Uber in which he was riding to drive the wrong way down a one-way street, causing a head-on collision with two vehicles. When Carroll—through his wife, Cheryl Walker, as power of attorney—sued, Uber sought to avoid accountability to a jury by enforcing its Terms of Use to force Carroll into arbitration. There was just one problem: Carroll had never created an Uber account or otherwise agreed to Uber's Terms of Use.

In an effort to force Carroll into arbitration anyway, Uber asks this Court to extend both its own precedent and D.C. law far beyond their current boundaries in at least two ways. First, it asks the Court to hold that the only notice required to form a contract is sending an unsolicited text message, even if the message is never seen and the consumer otherwise has no actual notice that they were sent an offer to contract. Second, it asks the Court to hold that an arbitration agreement can be enforced *against* a non-signatory under a third-party beneficiary theory, even if the non-signatory has not accepted or sought to enforce benefits under the contract. This Court should reject Uber's efforts to stretch the

1

law so far and conclude, for the reasons set forth below, that the district court correctly denied Uber's motion to compel arbitration of Carroll's claims.

## STATEMENT OF THE ISSUES

1. Did the district court correctly hold that Carroll did not form a contract with Uber merely by riding in an Uber when the only notice that doing so would accept Uber's Terms was a text message that he never saw and had no reason to expect and, in any event, was insufficient to conspicuously draw his attention to the Terms?

2. Did the district court correctly hold that Uber could not enforce its arbitration agreement with Carroll's wife against him as a third-party beneficiary?

## STATEMENT OF THE CASE

### I.   Factual Background

In March 2021, Carroll was catastrophically injured when his Uber driver, following Uber's driving directions and speeding, collided with oncoming traffic. JA021 ¶¶ 96, 101-03; JA023 ¶ 113, JA025 ¶ 128. On the morning of the day of the accident, Cheryl had ordered Carroll a ride home through the Uber app on her phone, because Carroll does not have an Uber account. JA020 ¶ 91; JA271 ¶ 1. Carroll's Uber driver arrived

about 20 minutes after Cheryl initially ordered it, and Carroll got into the rear seat of the car. JA020-21 ¶¶ 92, 96; JA161.

The driver used the Uber app to navigate to Carroll's home. JA021 ¶¶ 101-03. That navigation system was known by Uber to be "unreliable," and cause "confusion to Uber drivers during their rides." *Id.* ¶ 104. Compounding that confusion, the Uber app also sends drivers "time-sensitive notifications and electronic messages," which they are "financially incentivized to pay attention to" while they drive. JA023 ¶¶ 114-15.

That combination of distraction and faulty navigation caused Carroll's driver to turn into oncoming traffic. JA021-22 ¶¶ 106-07, 110, 114, 116-18. The driver followed the driving directions provided on the Uber app, which instructed him to drive the wrong way down a one-way road, and then make an unlawful left-hand turn. JA022 ¶¶ 110–12. The driver was also talking on his cell phone and was further distracted by notifications sent by Uber to his phone. JA023-24 ¶¶ 120-21. After he turned into oncoming traffic, he collided with two cars head on. JA024 ¶¶ 125–26.

Carroll was severely and permanently injured as a result of the collision. JA025 ¶ 128. He was admitted into a local intensive care unit for injuries to his spine, left arm, legs, ribs, and brain. *Id.* He remained intubated for twenty-six consecutive days. *Id.* ¶ 129. He has since undergone bilateral amputations on both his legs, JA026 ¶ 135, and continues to be intermittently hospitalized weeks at a time for consequences from his injuries, JA025 ¶ 130. He is bedridden and expects to spend the remainder of his life reliant on assisted care. JA027 ¶ 137.

## II. Procedural History

### A. Cheryl and Carroll Sue Uber for Causing Carroll's Injuries.

Following the collision, Cheryl—both in her own right and as Carroll's power of attorney—brought a lawsuit against the driver; Uber Technologies, Inc.; Rasier, LLC, a wholly owned subsidiary of Uber; and Rasier-DC, LLC, a wholly owned subsidiary of Rasier, LLC (collectively, "Uber"). JA08-09 ¶¶ 2, 4, 11; JA90 ¶ 5; JA275-85. On behalf of Carroll, the suit asserted a series of common-law claims, including negligence, negligence per se, strict liability, and failure-to-warn, *see* JA027-49, and, on behalf of Cheryl, a loss-of-consortium claim, *see* JA050-51. The claims

against the driver have since been voluntarily dismissed. *See* JA310; JA317 n.2.

### B. Though Carroll Doesn't Have an Uber Account, Uber Attempts to Compel Arbitration of Carroll's and Cheryl's Claims.

Uber filed a motion to compel arbitration. JA053; JA056. Uber's motion was premised on an arbitration agreement included in the Terms of Use for the Uber app. JA065-66. However, Carroll has never registered for an Uber account or used the Uber app. JA271 ¶ 1. Instead, when Carroll needed a ride, Cheryl would use her own Uber account to order one for him and would then call to let him know "that she had ordered [him] a taxi or an Uber ride and to let [him] know that [the] ride was on its way." JA272 ¶ 6.

According to Uber, Cheryl agreed to its Terms of Use when she initially registered on the Uber app in August 2017, and again when the app twice presented Cheryl with updated terms of use in a pop-up screen. JA313. Cheryl "never read through Uber's terms and conditions or was made aware of any specific terms and conditions." JA273 ¶ 6.

The Terms of Use in effect at the time of the ride contained an "Arbitration Agreement," requiring the user to "resolve any claim [they]

may have against Uber on an individual basis in arbitration." JA315. That encompasses, the Agreement explains, "any dispute, claim or controversy in any way arising out of or relating to" the Terms themselves, the user's "access to or use of the Services at any time," "incidents or accidents resulting in personal injury that [they] allege occurred in connection with [their] use of the Services," or the user's "relationship with Uber." *Id*. The Agreement also states that it "shall be binding upon . . . any claims brought by or against third-parties, including but not limited to . . . spouses," and that, "[t]o the extent that any third-party beneficiary to this agreement brings claims against the Parties; those claims shall also be subject to this Arbitration Agreement." JA316.

To use the Uber app to call a ride for a guest—as Cheryl did for Carroll—the account holder inputs the guest's name and phone number. JA316; JA092-93 ¶¶ 14-15. Then, Uber sends the guest a text message with the details of their ride, a link to the app's Terms, and a link to track the ride. JA316-17; JA093 ¶ 17. According to Uber, Uber sent Carroll one such text message on the morning of the collision, containing a hyperlink to Uber's Terms of Use. *See* JA093 ¶ 17; JA161. The text message

contained the following "mishmash of words, symbols, letters, and numbers," JA325:

> Your Uber from Cheryl is arriving in 10 minutes.\n \nBy taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl.\n \nChevrolet Captiva \n1EJ6584\n \nDriver George\ n+ 12023018948\n \nCheryl is paying for your trip.\n \nTrack here\nhttps://trip.uber.com/Wu8vBbIYEf3A\n\nReply STOP to opt out from SMS notifications.

JA316-17; JA093 ¶ 17; JA161. Carroll "did not see or read any text messages from Uber regarding their terms and conditions and was unaware that any such messages had been sent." JA271 ¶ 2. In fact, as a general matter, he did "not read or reply to text messages." JA272 ¶ 7. For that reason, he also "did not see or read any previous text messages from Uber regarding their terms and conditions." JA271 ¶ 3. And he "never viewed any terms or conditions of Uber's at any time, including on the date of the incident." *Id.* ¶ 5.

In its motion to compel arbitration, Uber argued that Carroll's and Cheryl's claims fell within the scope of its agreement, that Cheryl had accepted the arbitration agreement through her user account with Uber, and that Carroll either assented to the terms through the text message

or was bound to the agreement as a third-party beneficiary of Uber's agreement with Cheryl. *See* JA070-86.

## C. The District Court Denies Uber's Motion as to Carroll's Claims and Denies Uber's Motion for Reconsideration.

The district court granted Uber's motion as to Cheryl's loss-of-consortium claim, finding that she had formed an agreement with Uber and that questions about the agreement's enforceability were for an arbitrator to decide. JA319-22. But it denied the motion as to her claims brought on behalf of Carroll. JA330.

The court rejected Uber's argument that, despite Carroll never creating an Uber account, it formed a contract with Carroll when he rode in the Uber. JA325. As the court found, Uber's effort to enforce the arbitration agreement based on its text message alone went "one step further" than even the so-called "browsewrap" agreements courts have been reluctant to enforce. JA325-26. Assuming Uber's "novel theory" that receipt of the text message alone constituted notice, the court nonetheless found that Uber had not shown the "mishmash" text message put Carroll on inquiry notice of the Terms, *id.*, nor had it shown the Terms would

have appeared in any "preview" of the message displayed on Carroll's phone. JA326-27.

Next, the court rejected Uber's argument that Carroll was a third-party beneficiary of Cheryl's agreement with Uber. JA329. First, the court noted that Uber had pointed to no authority under D.C. law—applicable to the interpretation of the agreement—that "permits a party to a contract to enforce an arbitration provision *against* a third-party beneficiary," JA328 (emphasis in the original), and it cited other district courts in D.C. holding that it cannot, JA328-29. The court then held that, "[i]n any event," "the 'contract as a whole' does not contemplate a benefit to any party other than Cheryl and Uber." JA329. The court entered a stay of Cheryl's claim pending resolution of arbitration. JA330.

Uber filed a partial motion for reconsideration, JA331-32, and, the following day, a notice of appeal, seeking interlocutory review of the district court's order.[1] JA005; Dkt. 28; *see* 9 U.S.C. § 16(a). In its motion for reconsideration, Uber argued that the Court had made a "clear error" in its factual findings, because the "mishmash" text message could have

_____

[1] This Court held this appeal in abeyance pending the district court's resolution of Uber's motion for reconsideration.

appeared to Carroll in plain writing, and the Court had incorrectly relied on the "raw SMS code" generating the message. JA343 (emphasis omitted); JA348. Uber attached a new exhibit and declaration with recreated text messages in the form they would "typically appear on a phone screen." JA359 ¶ 11; JA347; JA351-56.

Applying the standard from Federal Rule of Civil Procedure 59(e) for a motion to alter or amend a judgment, the district court declined to accept Uber's newly submitted evidence, holding that any confusion regarding the appearance of the text message was "one of Uber's own making," JA409, because the unformatted text was the only evidence Uber submitted of what it sent to Carroll, with its representative testifying in no uncertain terms that is what the text said. JA408–09. Alternatively, the district court held that any "new evidence" provided by Uber did "not warrant a conclusion different from the one reached before," JA410, because Uber had not met its burden of showing that a reasonable user in Carroll's position would have seen and opened the text messages Uber sent, and it rejected again the idea that the "mere receipt" of text messages, without more, was sufficient to meet that burden, JA412. Again assuming that Uber's text-message notice theory could be

sustained, it found that, even with the new evidence, "Uber still offers no proof as to how the text message, or its preview, would have appeared on Plaintiff's or any other similar user's phone at the time of receipt." *Id.*

Uber filed an amended notice of appeal, seeking interlocutory review of both the original order denying its motion to compel arbitration and the order denying its motion for reconsideration. *See* Dkt. 38; JA006.

## STANDARD OF REVIEW

The district court analyzes the question whether there was an agreement to arbitrate under a summary judgment standard, granting a motion to compel arbitration only if there is no genuine issue as to any material fact and the moving party is entitled to arbitrate as a matter of law. *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020) (citing *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008)). This Court reviews the district court's denial of a motion to compel arbitration de novo. *See Selden v. Airbnb, Inc.*, 4 F.4th 148, 155 (D.C. Cir. 2021). Findings of fact underlying the decision are reviewed for clear error. *See Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 564 (9th Cir. 2014); *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1366 (11th Cir. 2004); *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169

F.3d 501, 504 (8th Cir. 1999); *Loc. Union No. 898 Of Int'l Bhd. of Elec. Workers v. XL Elec., Inc.*, 380 F.3d 868, 870 (5th Cir. 2004).

This Court reviews a denial of a motion for reconsideration under either Rule 59(e) or Rule 54 for abuse of discretion. *Cobell v. Jewell*, 802 F.3d 12, 23 (D.C. Cir. 2015).

## SUMMARY OF THE ARGUMENT

This Court should reject Uber's attempt to force Carroll into arbitration despite Carroll never creating an Uber account or agreeing to Uber's Terms, and the district court's well-reasoned analysis should be affirmed.

As an initial matter, contrary to Uber's assertion, the Federal Arbitration Act (FAA) does not place a thumb on the scale in favor of arbitration but, as the Supreme Court has repeatedly affirmed, requires that arbitration agreements be treated like all other contracts. Applying that equal-treatment principle, the district court correctly held that Uber had not met its burden of proving the existence of an arbitration agreement between it and Carroll because it had not shown that Carroll had notice of its offer to contract or that he accepted it by taking the Uber ride. **First**, to even potentially be on inquiry notice of Uber's Terms,

Carroll needed to open and view the text message containing the reference to them. But his testimony is clear: he did not see Uber's text message on the day of the collision, nor had he ever seen any other text messages from Uber. None of Uber's caselaw or evidence supports that Carroll should be deemed to have immediately read its text message simply because it was sent to him. **Second**, Uber has not shown that, even if Carroll saw the text message—which he did not—the reference to the Terms was sufficiently conspicuous to put him on inquiry notice. **Third**, because Carroll did not have notice of the Terms, Uber cannot show that he knew that, by riding in the Uber, he would manifest assent to them. **Fourth**, the district court did not err in denying Uber's motion for reconsideration under Rule 59(e) because it submitted new evidence that it could have submitted before and that, in any event, would not have changed the outcome.

The district court also correctly held that Uber cannot enforce its agreement with Cheryl against Carroll under a third-party beneficiary theory. **First**, D.C. law allows third-party beneficiaries to enforce contracts but does not allow contracts to be enforced against third-party beneficiaries, and this Court should reject Uber's attempt to expand

D.C.'s third-party beneficiary law beyond how any court has applied it. **Second**, attempting to avoid D.C.'s rule that contracts cannot be enforced against third-party beneficiaries, Uber conflates the third-party beneficiary and equitable estoppel doctrines. But Uber has forfeited any equitable estoppel argument by not raising it below or in its Opening Brief, and this Court should disregard any attempt by Uber to shoehorn an equitable estoppel theory into a third-party beneficiary theory. **Third,** even if this Court does accept Uber's argument that, contrary to D.C. law, a third-party beneficiary theory can be used to bind a non-signatory to a contract, Uber cannot do so here. Carroll is not an intended beneficiary of Cheryl's contract with Uber, nor has he accepted any intended benefit or sought to benefit from the contract.

In short, Uber cannot bind Carroll to an arbitration agreement contained in a link contained in a text message that Carroll never saw, nor can it bind him to his wife's arbitration agreement simply because she called him an Uber. This Court should affirm the district court's denial of Uber's motion to compel arbitration.

**ARGUMENT**

## I. The Federal Arbitration Act Requires Courts to Treat Arbitration Agreements Like All Other Contracts.

Though Uber relies on the FAA's often-invoked "liberal federal policy favoring arbitration agreements," Opening Br. at 6, the Supreme Court has held that this policy makes arbitration agreements "as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). In *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Supreme Court reiterated that "[t]he federal policy is about treating arbitration contracts *like all others*, not about fostering arbitration." *Id.* at 418 (emphasis added). Courts "may not devise novel rules to favor arbitration over litigation." *Id.* Instead, faced with an "ordinary procedural rule—whether of waiver or forfeiture or what-have-you," that "would counsel against enforcement of an arbitration contract," courts must decline to enforce the arbitration contract, just as they would all other contracts faced with the same defense. *Id.*

Before the FAA (or any "policy favoring arbitration") can be applied, a court must first determine whether the parties have agreed to arbitrate, as it would any other contract. *See Bank of Am., N.A. v. D.C.,*

80 A.3d 650, 667 (D.C. 2013) ("the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead ordinary contract principles determine who is bound." (cleaned up)). And "arbitration is strictly a matter of consent." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 651 (2022) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)). So, courts may "not require a party to submit to arbitrate any dispute that it has not agreed" to arbitrate. *Univ. of the D.C. Fac. Ass'n v. Bd. of Trustees of Univ. of the D.C.*, 257 A.3d 1026, 1031 (D.C. 2021). In short, the fact that the contract at issue is an arbitration agreement has no bearing on whether state law bars its enforcement, and the Court must treat the Arbitration Agreement in Uber's Terms as it would any other contract.

## II. The District Court Correctly Held that It Was Uber's Burden to Prove that an Agreement to Arbitrate Was Formed, and It Failed to Do So.

Uber failed to meet its burden to show that it formed an arbitration agreement with Carroll. Applying this Court's well-settled precedent, the district court properly held that Uber had the burden to "present evidence sufficient to demonstrate an enforceable agreement to

arbitrate." JA318 (quoting *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 9 (D.D.C. 2021)); *see Camara*, 952 F.3d at 373 (explaining that "the party seeking to enforce an arbitration agreement" has "the burden of proving that [the non-movant] agreed to arbitrate"). To prove that it formed an arbitration agreement with Carroll under D.C. law, Uber must show "an offer, an acceptance, and valuable consideration exchanged between the parties." *Osvatics*, 535 F. Supp. 3d at 10 (quotation omitted). In other words, it must show "the parties 'objectively manifested' their intent 'to be bound contractually.'" *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 907 (D.C. Cir. 2024) (quoting *Dyer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009)). It failed to do so. Uber has not even shown that Carroll had notice of *any* offer to contract, let alone notice of the offer's terms or that riding in the Uber constituted acceptance of those terms.

### A. Uber Did Not Prove Carroll Had Notice of an Offer to Contract.

Carroll could not have contracted to arbitrate unless he knew he was doing so: "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." Williston on Contracts § 4:16 (4th ed.). Thus, Uber was first required to show that Carroll knew "that terms [were] being presented" to him that he could

accept by riding in the Uber. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012). It did not do so.

The only evidence Uber offered was that it sent a text message to Carroll's phone number containing a link to its Terms. It did not produce any evidence, whether direct or circumstantial, that the text message was received, opened, or viewed by Carroll or that Carroll had any other reason to know that Uber sent him a message with an offer to contract. On the other hand, Carroll testified that he does not read text messages, JA272 ¶ 7; that, on the day of the crash, he "did not see or read any text messages from Uber regarding their terms and conditions and was unaware that any such messages had been sent," JA271 ¶ 2; and that he "never saw . . . any communication from Uber, text or otherwise, at any time," *Id.* ¶¶ 3-4.

Thus, Uber has not met its burden of proving that Carroll "knew of" its offer to contract at the time he took the Uber ride, Williston on Contracts § 4:16, and "regardless of apparent manifestation of his consent," Carroll is "not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious," *Selden*, 4 F.4th at 156 (internal quotation marks

omitted); *see also Sexton v. Xerox Corp.*, 2024 WL 4201186, at *4 (D. Haw. Sept. 16, 2024) ("Simply put, a person cannot accept an offer if they received no notice of it.").

Uber does not dispute Carroll's testimony that he did not see the text message,[2] Opening Br. at 28, but argues that he should nonetheless be deemed to have "inquiry notice" of the Terms because a "reasonable person" would have looked at the message, *id.* at 24-25. That is wrong. For Carroll to have inquiry notice of the Terms, there first had to be *actual* notice of something that would alert him to read them. *See, e.g.*, *Schnabel*, 697 F.3d at 120 ("Inquiry notice is *actual notice* of circumstances sufficient to put a prudent [person] upon inquiry.") (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 n.14 (2d Cir. 2002)) (emphasis added)); *see also Clay Props., Inc. v. Washington Post Co.*, 604 A.2d 890, 895 (D.C. 1992) ("inquiry notice" means someone "*is aware* of circumstances" that would cause "a person of ordinary prudence" to "inquire further") (emphasis added). Here, then, Uber

---

[2] Uber calls Carroll's sworn testimony "improbabl[e]." Opening Br. at 28. Not only is Carroll's testimony undisputed, it's in fact probable that an individual who does not have an Uber account or call their own Uber will not open and review an unsolicited text message from Uber within less than 10 minutes of receiving it.

needed to show that Carroll had actual notice of the contents of the text message, which could prompt him to inquire further by clicking the hyperlink in the message and reading the Terms. So, because he did not know he received a text, let alone what it said, Uber's inquiry notice argument fails.

The cases cited by Uber for the inquiry notice standard (at 24) illustrate this point. These are what are referred to as "clickwrap" and "sign-in-wrap" cases, in which the plaintiff undisputedly viewed a webpage that contained a hyperlink to terms before checking a box and/or clicking a button to accept them. *See Selden*, 4 F.4th at 156-57. The question in such cases is whether the reference to the terms on the webpage the consumer interacted with was sufficiently clear and conspicuous to put them on notice that their click would accept the terms. *Id.* at 156.

For example, in *Selden*, there was no dispute that the consumer had navigated to a page on the Airbnb website that invited him to sign up for an account and, "[d]irectly below" the sign-up button, stated: "By signing up, I agree to Airbnb's Terms of Service[,]" with conspicuous hyperlinks to the terms. 4 F.4th at 156-57. And there was no dispute that the

consumer clicked the sign-up button and created an account. *Id.* The Court concluded that the part of the webpage he saw was sufficient to put him on "inquiry notice" under California law of Airbnb's terms and conditions, even though he failed to click on the hyperlinks so did not have actual notice of the terms themselves. *Id.* And in *Gambo v. Lyft*, 642 F. Supp. 3d 46, 53 (D.D.C. 2024), *Christian v. Uber Techs., Inc.*, 775 F. Supp. 3d 272, 277 (D.D.C. Mar. 17, 2025), and *Hilbert v. Uber Techs., Inc.*, 2025 WL 42725, at *3 (D.D.C. Jan. 7, 2025),[3] the consumers had each checked a box indicating agreement to the terms of service (which were hyperlinked and located next to the box), putting them on "inquiry notice" of the terms even if they did not click the hyperlink.

The "inquiry notice" standard, then, binds consumers to contracts they did not read so long as they had "actual notice," *Schnabel*, 697 F.3d at 120, that there were contract terms available at a link that they were

---

[3] Uber suggests that, in *Hilbert*, the court enforced its terms despite the blind plaintiff saying he did not recall hearing his screen reader read the screen presenting the terms before he accepted them. Opening Br. at 25. But Uber omits that it submitted a "declaration affirming that VoiceOver would have read aloud the relevant information on the pop-up screen," including the notice of the terms of service. 2025 WL 42725, at *3. Based on that, the court concluded the plaintiff had "inquiry notice" because, contrary to his recollection, the software read him the page describing and linking to the terms. *Id.*

agreeing to by taking a particular action. It does *not* require consumers "to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1179 (9th Cir. 2014). And it definitely does not require consumers to always keep an eye on their phones in case they receive unexpected messages containing binding terms of service, as Uber contends.

Unlike *Selden* or similar cases where consumers clicked a button or checked a box demonstrating that they saw the page with hyperlinked terms, courts find no mutual assent when a consumer did not actually view the page or message containing the hyperlink. For example, in *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258 (Me. 2022), the Maine Law Court held that an email Uber sent with its Terms was insufficient to form a contract because the consumer testified "she was unaware of the email," and, without knowing that Uber was offering to enter into a contract with her, "would have had no reason to pay attention to an email from Uber." *Id.* at 273. The court emphasized that, despite "never open[ing] the email message," the consumer was able to book an Uber ride, justifying the inference that the customer was unaware the email

would contain a binding contract. *Id.* The facts here are nearly identical: Carroll was unaware of Uber's text message, had no actual notice of any facts that would cause him to look for contract terms in a message from Uber, and opening the text message was unnecessary to take an Uber ride.

Likewise, other courts have held that an unexpected email or text message of which the consumer was unaware is insufficient to put them on notice of contract terms. *See, e.g.*, *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 886 (N.D. Ill. 2020) (where amended terms of use were emailed, defendant had "failed to present evidence showing that [plaintiff] ever was aware of the Terms of Use—let alone assented to them"); *Freitas v. Cricket Wireless, LLC*, 2022 WL 1082014, at *6 (N.D. Cal. Apr. 11, 2022) (denying motion to compel arbitration based on text messages sent to class members where evidence cast doubt on "whether class members actually received the text message"); *Towns v. W. Creek Fin., Inc.*, 2023 WL 7490007, at *5-7 (E.D. Cal. Nov. 13, 2023) (absent evidence the plaintiff saw the arbitration agreement, company sending plaintiff an "email with a copy of the Agreement is insufficient to show assent").

These cases are consistent with "browsewrap" cases involving websites that make terms of use available through a hyperlink and provide that a consumer assents to them simply by using the site. As the district court noted, "[c]ourts are generally reluctant to enforce such agreements because they often leave users unaware that contractual terms were even offered." JA325 (quoting *Oberstein v. Live Nation Enter., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023)). The bar in browsewrap cases is high because, unlike a clickwrap case where someone clicked to indicate assent, it is difficult to show that the consumer saw the hyperlink that would put them on inquiry notice of terms of service. *See, e.g.*, *Nguyen*, 763 F.3d at 1179 (finding no agreement was formed even though the website included a "conspicuous hyperlink on every page of the website" close to "relevant buttons users must click on"); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (finding no notice because, "without direct evidence that Plaintiffs click[ed] on the Terms of Use, we cannot conclude that Plaintiffs ever viewed, let alone manifested assent to, the Terms of Use").

No D.C. court has enforced a "browsewrap" agreement, and, as the district court found here, Uber's theory of contracting goes even "one step

further." JA325. Browsewrap cases start with the premise that the consumer in fact viewed and interacted with the webpage at issue, even if they did not take affirmative action to assent to terms. Here, by contrast, Uber has produced no evidence that Carroll saw any part of its text message. Thus, in the browsewrap analogy, Uber's argument would mean that terms of use linked on a website could be binding on a consumer who did not even visit the website. That "novel theory" is unsupported by any D.C. law and should be rejected. *Id.*

Uber falls back on two arguments as to why Carroll should be deemed to have notice despite never seeing the text message. First, because Carroll would have to read the message to be on inquiry notice of the Terms, Uber essentially urges the Court to adopt a "mailbox rule" for text messages, such that whenever a text message is sent to a consumer's phone, they are presumed to not only have received it, but also to have read it. Uber's rule goes even further than the mailbox rule for mailed offers because it presumes that any text sent is read *within 10 minutes* of receipt. JA161 (stating that Uber was arriving in 10 minutes). But Uber has pointed to nothing in D.C. law that supports such a rule, and adopting it here would upend the fundamental principle that

contracts require both notice of an offer to contract and mutual assent. *See In re Estate of Fulton,* 287 A.3d 253, 261 (D.C. 2023) ("A party cannot unilaterally declare that they have an agreement with another without evidence that the two have communicated about its terms."). Moreover, even if such a rule existed, Carroll's testimony that he did not read the text message would rebut any presumption that he did. *See Bean v. Perdue*, 316 F. Supp. 3d 220, 228 (D.D.C. 2018).

The out-of-circuit cases cited by Uber (at 27-29) that it contends stand for the proposition that "emails and text messages are sufficient to give rise to an enforceable contract" do not support its text-message mailbox rule. In all of them,[4] it was either undisputed or there was strong evidence that the consumer had in fact received and opened the relevant text message or email. *See Starkey v. G Adventures, Inc.,* 796 F.3d 193, 196 (2d Cir. 2015) ("Starkey does not dispute that she received the relevant emails."); *Silva v. Mpower Energy, LLC*, 2025 WL 934322, at *4 (S.D.N.Y. Mar. 27, 2025) (defendant produced signed agreement and

---

[4] *Greenberg v. Drs. Assocs., Inc.*, 338 F. Supp. 3d 1280, 1282 (S.D. Fla. 2018), did not involve terms sent by text message. Instead, the consumer viewed an online offer that referenced and linked terms and conditions and then *accepted* the offer by sending a text message. *Id.* at 1282.

digital forensic evidence that plaintiff opened follow-up text message with copy of agreement); *Rodriguez v. Block, Inc.*, 2023 WL 2854434, at *7 (W.D. Mich. Feb. 27, 2023) (consumer created account by entering code sent in text message along with terms of service, indicating she had opened and read the message), *R. & R. adopted*, 2023 WL 2569116 (W.D. Mich. Mar. 20, 2023); *Thorne v. Square, Inc.*, 2022 WL 542383, at *12 (E.D.N.Y. Feb. 23, 2022) (same); *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1029 (Fla. Dist. Ct. App. 2018) ("Porter admitted he saw the messages and the trial court found that Porter received the text message."); *Macasero v. ENT Credit Union*, 533 P.3d 982, 987 (Colo. App. 2023) (defendant produced evidence that consumer received email). Uber has pointed to no case where a court assumed—without evidence and in the face of testimony to the contrary—that a consumer read an unsolicited text message. And it has certainly not pointed to one in which the court assumed that the message was read *within 10 minutes* of being sent. It cannot be that a consumer is bound to a contract by failing to take their phone out of their pocket or bag for 10 minutes.

Second, Uber argues that the Court should conclude Carroll was on "inquiry notice" of the message because a "reasonable person" in his

position would have opened and read the text message. Opening Br. at 25. Again, this would stretch the "inquiry notice" standard far beyond how any court has applied it, finding inquiry notice even if the consumer did not have actual notice of any facts indicating the existence of contract terms. But, in any event, Uber is wrong that a reasonable person would expect to receive a text message from Uber with binding contract terms simply because someone else had called him an Uber, particularly where they, like Carroll here, had never interacted with Uber by text. JA271 ¶¶ 3-4. It was not clear error for the district court to find that it is "no less reasonable to think" that a consumer would not "open and read a text message sent from the ridesharing service—especially when the ridesharing information is available from another source (namely, the individual who ordered the car)." JA411-12; *see also Kauders v. Uber Techs, Inc.*, 159 N.E.3d 1033, 575 (Mass. 2021) (finding that a reasonable consumer would not expect that even signing up for an Uber account "would be accompanied by the type of extensive terms and conditions" in Uber's Terms).

**B.    Even if Carroll Read Uber's Text Message, Uber Did Not Prove that the Message Provided Him with Conspicuous Notice of the Terms.**

Because Uber has failed to show the very first step in the notice analysis—that Carroll in fact read its text message with the hyperlink to the terms—the district court's finding that no contract was formed should be affirmed. But even if this Court concludes, contrary to his testimony, that Carroll *did* read the text message, the district court correctly found that Uber did not meet its burden to show that the message put him on inquiry notice of Uber's Terms of Use.

It was Uber's burden, *Camara*, 952 F.3d at 373, to present evidence showing that the "layout and language" of the message was sufficiently "conspicuous" to put Carroll on notice that by riding in the Uber he was assenting to the Terms. *Selden*, 4 F.4th at 156. The only evidence Uber submitted was an affidavit and exhibit stating that Carroll was sent the following message:

> Your Uber from Cheryl is arriving in 10 minutes.\n \nBy taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl.\n \nChevrolet Captiva \n1EJ6584\n \nDriver George\ n+ 12023018948\n \nCheryl is paying for your trip.\n \nTrack here\nhttps://trip.uber.com/Wu8vBbIYEf3A\n\nReply STOP to opt out from SMS notifications.

JA93 ¶ 17, JA161. It did not provide any information concerning how this text would have appeared on Carroll's phone screen, either when received or when opened, other than to assert—without support—that the hyperlink would appear underlined and in blue. JA93. Uber's failure to provide evidence of how the text message looked to Carroll alone justified denying Uber's motion to compel. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1331 (11th Cir. 2016) (denying motion to compel in part because "there is no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card").

And even applying the inquiry notice standard to the limited evidence Uber did submit, the district court correctly found the link to the Terms insufficiently "clear and conspicuous" to put a reasonable person on inquiry notice of the Terms. JA325; *see Carter v. Ralph Lauren Corp.*, 683 F. Supp. 3d 400, 414 (S.D.N.Y. 2023) (denying motion to compel arbitration because text message did "not provide the terms . . . in a 'clear and conspicuous way'"). As the district court described, the message was "a mishmash of words, symbols, letters, and numbers, within which the hyperlink to the Terms was integrated." JA325. Unlike

cases in which courts have found adequate notice, the reference to the Terms was combined with other information displayed in a single block of text of the same font size, including when the Uber would be arriving, the driver's name, and a link to track the Uber, and it included visually distracting letters and symbols, rather than being "a simple, streamlined design" that was "unobscured by other visual elements." *Selden*, 4 F.4th at 157; *see also*, *e.g.*, *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018) (finding that "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished [a] hyperlink's capability to grab the user's attention").

Uber barely pushes back against the district court's assessment of this evidence, arguing in a footnote that the message was sufficient because "it contains a complete sentence and a bright blue hyperlink," dismissing the text, numbers, and symbols around that sentence as merely "aesthetic judgments." Opening Br. at 30 n.3 (quoting *Selden*, 4 F.4th at 157)). To begin with, the statement that the hyperlink appeared "bright blue" is pure speculation. It appears in the record in the same font and color as the rest of the message, JA161, and the way the message

appears on a particular user's phone depends on how that phone displays links. The record is entirely silent regarding the type of phone Carroll had; even users with smartphones may find that their phones don't display the web address as a clickable link. And a link is useless if a user has a phone with no internet access. *See* Opening Br. at 39 (admitting that there is no record evidence as to whether "Mr. Walker used a smartphone (and not a flip phone)").

And even if the link to the Terms was blue, the block of text with extraneous letters and symbols, including a phone number and another link, would make it difficult to notice the link to the Terms specifically. *See id.* The link would be even less conspicuous if, because of the type of phone or user settings like text size, the user had to scroll past the key information in the message—when the Uber was arriving—to find it on another screen. In *Selden*, this Court found it important that the sign-in page appeared "on a single screen" on the specific type of phone used by the plaintiff and "required no scrolling to see the notice of the Terms of Service." *Selden*, 4 F.4th at 157. Here, on the other hand, there is no evidence as to whether the text message would have appeared on a "single screen" on Carroll's particular phone or whether he had to scroll

down to see the hyperlink to the Terms. *See also Specht,* 306 F.3d at 31-32 (concluding that terms on portion of webpage plaintiffs did not need to scroll to before downloading software was insufficient for inquiry notice, even if they knew part of page remained "unexplored"); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (finding no notice where consumer "could not even see the link to [the terms] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase"), *aff'd*, 380 F. App'x 22 (2d Cir. 2010). Thus, the district court correctly concluded that Uber had not met its burden of showing the message provided conspicuous notice of the Terms, "much less that the . . . terms included an arbitration agreement." *Carter*, 683 F. Supp. 3d at 416.

Uber tries to dodge these deficiencies in the evidence it submitted to meet its burden by instead pointing to its post-order declaration and exhibit of a "recreated text message," JA347, showing how it would "typically appear on a phone screen," JA359 ¶ 11; Opening Br. at 26. Given Uber's failure to present it with its motion to compel, the district court correctly disregarded that evidence. *See* section II.D, *infra*. But even if this Court finds the district court abused its considerable

discretion in doing so, Uber still has not met its burden of showing that the text message *Carroll* would have seen would have put him on notice of the Terms. Uber's declarant does not say how the recreated message was generated or what type of phone it is supposed to replicate. JA359. That is fatal to its case because, unlike an app, the format of a given text message depends on the phone that receives it, and Uber's recreation of how the message would appear on "a phone" says nothing about how it would have looked on Carroll's phone. JA359 ¶ 10 (stating that the code Uber sends is "interpreted by the user's phone"); Opening Br. at 39 (acknowledging that "mobile phones vary in how they notify users regarding incoming text messages"). Given that, even Uber's belated evidence does not meet its burden of showing that Carroll would have been on inquiry notice of the Terms if he had read the text message from Uber. *Cf. Selden*, 4 F.4th at 157 (examining how notice of terms would look on plaintiff's iPhone); *Cullinane*, 893 F.3d at 58-59 (reviewing screenshots of how app looked on iPhone where plaintiffs all had iPhones).

Uber faults the district court for relying on "facts and arguments outside the record" by pointing out that Uber did not prove that any

notification or "preview screen" on Carroll's phone would have contained a reference to the Terms. Opening Br. at 32-33. But Uber forgets *it* has the burden to provide evidence to support its motion, including sufficient evidence that Carroll was on notice of the link to the Terms. As the district court noted, at best, Uber's evidence showed only what the full text message said. *See* JA412-13. But for that evidence to help its case, Uber had to show that Carroll opened and saw the message, thus giving him actual notice of the language Uber relied on. *See* section II.A, *supra*. Absent that evidence, Uber could have at least shown that the reference to the Terms was visible to Carroll if he looked at his phone and saw a "preview" but did not open the message (though, again, there's no evidence that happened here). JA413. Uber did not do so, leaving the district court to conclude there was no evidence Carroll saw the reference to the Terms. JA414 (noting that browsewrap cases "at least involve some evidence that a person directly interacted with a webpage containing a hyperlink to its terms"). The district court did not err in pointing out Uber's lack of proof on this point. Nor was its conclusion about the preview screen necessary to its holding because, for the reasons described

above, the Terms were not sufficiently conspicuous to put Carroll on notice even if he did view the whole message.

## C. Uber Failed to Prove that Carroll Assented to its Terms by Taking the Uber Ride.

As Uber acknowledges, "a party's conduct is not a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Camara*, 952 F.3d at 375 (quoting Restatement (Second) of Contracts § 19(2) (1981)). Thus, when Carroll rode in the Uber, he had to be "aware that he was signaling an intent to be bound." *Id.* He was not. As described above, Carroll was "unaware" that he had received a text message from Uber, JA271 ¶ 2, so he had neither actual notice nor inquiry notice that riding in the Uber would bind him to Uber's Terms. And unlike cases where the plaintiff clicked a button or checked a box alongside language like "I accept," nothing about the act of riding in an Uber, standing alone, indicated that it was binding Carroll to a contract. *See Marshall v. Georgetown Mem'l Hosp.,* 112 F.4th 211, 223 (4th Cir. 2024) (explaining that "unlike 'accept' or 'agree,'" clicking a button labeled "submit" alone did not put plaintiff on notice that clicking would assent to a contract); *Kauders*, 159 N.E.3d at 575, 580 (explaining that

"[w]here the connection between the action taken and the terms is unclear, or where the action taken does not clearly signify assent, it will be difficult for the offeror to carry its burden" and finding no assent where user clicked button labeled "Done"). Thus, the district court correctly found Carroll did not assent to any agreement by taking the Uber ride.

### D. The District Court Did Not Abuse its Discretion in Denying Uber's Motion for Reconsideration.

The district court correctly found, in its discretion, that Uber's late-filed evidence did not warrant reconsideration. Uber argues that the district court should have granted its motion for three reasons, none of which holds weight. First, it contends the district court applied the wrong standard to the motion for reconsideration and should have applied Rule 54 instead of Rule 59. That is wrong. As the district court explained, Rule 59 applies to a "motion to alter or amend a *judgment*," and a "judgment" is defined as "any order from which an appeal lies." JA405 (quoting Fed. Rs. Civ. P. 59(e) and 54(a), respectively). Since an order denying a motion to compel arbitration is immediately appealable, 9 U.S.C. § 16(a)(1), it meets that definition, and Rule 59 applies. *See Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 7 (1st Cir. 2005); *Gen. Ass'n of Regular Baptist Churches v. Scott*, 549 F. App'x 531, 534 (7th Cir. 2013).

Uber argues that there was no "judgment" when it filed the motion for reconsideration because the district court failed to enter its judgment in a document separate from the order, as required by Rule 58.[5] Opening Br. 35-36. Uber did not raise this argument in its motion, *see* JA339-41, and it is therefore waived. But, more importantly, it makes no sense: Uber has not explained how the district court's order was any less an "order from which an appeal lies" simply because the court had not set forth the judgment in a separate document. Fed. R. Civ. P. 54(a). Indeed, Uber filed an appeal despite the lack of a separate judgment.

The cases cited by Uber do not support application of Rule 54(b). *Abdulwali v. WMATA*, 315 F.3d 302, 304 (D.C. Cir. 2003) concerned the question whether an appeal was timely filed, and the court concluded that, because the district court had not set forth the judgment in a separate document, the time to appeal had not begun to run, and the appeal at issue was timely. It did not hold that, in the absence of a separately set forth judgment, there was no appealable order at all. To the contrary, it expressly recognized that "the district court's . . . order

---

[5] The district court later identified and remedied this in its order on the motion for reconsideration. *See* JA406 n.2; JA415.

constituted a 'judgment,'" and proceeded to decide the appeal. *Id.*

Likewise, here, the lack of a separate judgment under Rule 58 does not

change the order's nature as a "judgment" to which Rule 59(e) applies.

*Cobell*, 802 F.3d at 25, is no help to Uber either because it concerned

orders on attorney's fees that the court found not to be appealable,

meaning they did not meet the plain definition of a "judgment." Thus, the

district court correctly determined that Rule 59 applied.

Second, the district court did not abuse its discretion in denying the

motion for reconsideration under Rule 59. "A Rule 59(e) motion is

discretionary and need not be granted unless the district court finds that

there is an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest

injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quotation

omitted). Uber contends that the district court should have concluded

that it committed "clear error" from which "manifest injustice" would

result because the court relied on Uber's affidavit to draw conclusions

about the content of its text message. Opening Br. at 36-37. Uber

complains that it did not know the district court was going to rely on the

affidavit until it did so, and that therefore it should have been permitted

the opportunity to present new evidence. *Id.* But, as the district court recognized, Uber "has only itself to blame for creating a misapprehension of fact." JA408. Uber had the burden to prove the existence of an agreement to arbitrate, requiring it to establish that the layout of its text message made the terms of use "conspicuous." *Selden*, 4 F.4th at 157. Yet, it chose to submit only the affidavit in which its witness testified that Carroll "received" a text message "stating" the precise language, JA093 ¶ 17; JA161, that Uber now contends should be disregarded as "unformatted code," Opening Br. at 37. Nowhere in Uber's briefs or evidence did Uber state that this "unformatted code" was not a true representation of what was sent to Carroll, likely because Uber in fact has no idea what the text message looked like on Carroll's phone. The district court did not clearly err in taking Uber's evidence at face value.

Uber argues that the district court's decision was error because "[t]here was no dispute between the parties that the quoted \n symbols in the raw SMS code did not appear on Mr. Walker's phone," and because Uber quoted parts of the text message without some of the "code" in its motion. *Id.* It is wrong on both counts. To begin with, Plaintiff never argued that the text message in the affidavit was how it appeared on

Carroll's phone for the simple reason that Uber never argued that was *not* how it appeared. It could just as well be said that there was no dispute between the parties that the text message appeared as Uber presented it. Moreover, though Uber quoted portions of the message in its motion, the district court was entitled to rely on Uber's evidence for the facts, especially where Uber had the burden of supporting its motion with evidence sufficient to show it was entitled to compel arbitration as a matter of law.

Third, in any event, the district court correctly concluded that Uber's new evidence would not have made a difference: Uber's mock-up of a text message, without any information about how it was created and what kind of phone it is designed to represent, does not carry its burden to show that Carroll had conspicuous notice of the terms of service if he viewed the message. *See* section II.B, *infra*. Nor does the difference in how the text message appeared change the fact that Carroll was not aware of the text message and had no reason to look for it. *See* section II.A, *infra*.

In short, the district court did not abuse its discretion in its straightforward application of Rule 59 here. But even if this Court finds

that Rule 54(b) applies, Uber has not advanced any argument in its Opening Brief as to why the district court was wrong to deny its motion for reconsideration under Rule 54(b)'s standard. *See* Opening Br. at 36-40 (applying Rule 59(e)). And for good reason: like a motion under Rule 59(e), "a Rule 54(b) motion is not an avenue for raising new arguments that could have, and should have, been brought before a court issued its ruling" nor to "present claims the Court already considered." *Davis v. D.C. Child and Family Serv. Agency*, 2014 WL 12802261, *3 (D.D.C. Oct. 20, 2014); *see also Estate ex rel. Gaither v. District of Columbia,* 771 F. Supp. 2d 5, 10 (D.D.C. 2011). That is precisely what Uber attempted to do here, and this Court can affirm because denial of the motion was proper even under Rule 54(b).

### III. The District Court Correctly Held that Uber Cannot Enforce its Agreement with Cheryl Against Carroll as a Third-Party Beneficiary.

Uber argues that even in the absence of the notice typically required for contract formation, Carroll's claims must be arbitrated because he is an "intended third-party beneficiary" of Uber's agreement with Cheryl. But this argument, too, fails. Uber cannot rely on the third-party beneficiary doctrine for the simple reason that, under D.C. law, it

applies only to non-signatories enforcing benefits against signatories, not vice versa. But even if, as Uber argues contrary to D.C. law, a non-signatory can be bound if they are an intended beneficiary and seek to benefit from the agreement, Uber has proved neither. This Court should reject Uber's attempt to bind Carroll to an agreement he did not sign, was not aware existed, and that was not intended for his benefit.

### A. D.C. Law Does Not Permit Uber to Enforce its Terms *Against* a Third-Party Beneficiary.

As Uber recognizes (at 41), state law governs whether a non-signatory can enforce an arbitration agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). So the question here is whether D.C. law authorizes Uber to enforce Cheryl's agreement with Uber against Carroll as a third-party beneficiary. It does not. *See Charlton v. Mond*, 987 A.2d 436, 441 (D.C. 2010). Uber has cited no D.C. case that does what Uber asks this Court to do here: enforce a contract *against* a non-signatory under a third-party beneficiary theory.

As a general matter, under D.C. law, only signatories to a contract can enforce it. *See Fort Lincoln Civic Ass'n. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008). The third-party beneficiary doctrine is a limited exception to this principle, and it allows a non-

signatory to enforce a contract against a signatory when the contract was "intended for [the non-signatory's] *direct* benefit." *Guam Indus. Servs., Inc. v. Rumsfeld*, 441 F. Supp. 2d 21, 26 n.7 (D.D.C. 2006) (quotation omitted); *see Jahanbein v. The Ndidi Condo. Unit Owners Ass'n, Inc.*, 85 A.3d 824, 830-31 (D.C. 2014). That makes sense: when the parties to a contract intend to benefit a non-signatory, the non-signatory is given the right to enforce the intended benefit.

But, contrary to Uber's argument, that doesn't mean that a contract can *bind* a non-signatory simply because they are a third-party beneficiary. *See EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *Charlton*, 987 A.2d at 441 ("Non-parties owe no contractual duty to the contracting parties."). Applying D.C. law, courts in this Circuit consistently hold that third-party beneficiaries may enforce contracts against signatories, but "not vice versa." *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 179 (D.D.C. 2017); *see Guttenberg v. Emery*, 41 F. Supp. 3d 61, 68 (D.D.C. 2014); *Jones v. Quintana*, 872 F. Supp. 2d 48, 57 n.3 (D.D.C. 2012). For example, in *Guttenberg*, the court rejected the argument that a settlement agreement could be enforced against the non-signatory

spouse of a signatory, concluding that the spouse "had no duties under a contract to which she was not a party," and thus could not have breached the contract. 41 F. Supp. 3d at 68. And in *Jones*, the court called the argument that a contract could be enforced against a third-party beneficiary "perplexing" because third-party beneficiary status "would only entitle Plaintiff to enforce the agreement against Defendants, not *vice versa*." 872 F. Supp. 2d at 57 n.3. These cases simply apply the bedrock mutual assent requirement for contract formation. *Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995). A party cannot be involuntarily bound by an agreement to which they did not assent simply because the parties to the agreement decided so.

Uber argues that the district court erred in relying on *Bradley* and *Guttenberg* because "neither case concerns arbitration." Opening Br. at 43. But in doing so, Uber improperly urges this Court to craft an arbitration-specific rule for non-signatory enforcement, a move prohibited by the Supreme Court. Courts must enforce arbitration clauses "just as [they] would [] any other kind" of contract and cannot "devise novel rules to favor arbitration over litigation." *Morgan*, 596 U.S. at 412. If D.C. law prohibits enforcement of a settlement agreement

against a non-signatory spouse of a signatory, *see Guttenberg*, 41 F. Supp. 3d at 68, then it prohibits enforcement of an arbitration agreement under the same circumstances.[6]

Uber also argues that this Court should disregard *Guttenberg* and *Jones* because they cite the U.S. Supreme Court's statement in *Waffle House,* 534 U.S. at 294, that "a contract cannot bind a nonparty." Opening Br. at 43. Contrary to Uber's argument, that remains good law after *Arthur Andersen*, which addressed whether a non-signatory could *enforce* an arbitration agreement under § 3 of the FAA based on an equitable estoppel theory. 556 U.S. at 630-32. The Supreme Court held that the FAA did not prohibit non-signatory enforcement because ordinary state-law contract principles apply to arbitration agreements. *Id.* The court explained that, in *Waffle House*, the non-signatory "obviously had no third-party obligations under the contract in question," but that did not

---

[6] Uber does cite two third-party beneficiary cases where courts entertained a third-party beneficiary against a non-signatory, but in neither case was application of the theory under D.C law challenged, and in each case the court found that the non-signatory was not a third-party beneficiary, so application of the doctrine did not affect the outcome. *See Oehme, van Sweden & Assocs. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 100 (D.D.C. 2014); *Mariano v. Gharai*, 999 F. Supp. 2d 167, 171–72 (D.D.C. 2013).

mean that the FAA did not permit enforcement by non-signatories if state law allowed it. *Id.* at 632. Nothing in *Arthur Andersen*—a case about enforcement *by* a non-signatory—undermines *Waffle House*'s statement that contracts generally do not bind non-parties. At most, whether they can do so is a question of state law, and both *Guttenberg* and *Jones* applied D.C. law.

In short, then, the rule in D.C. is clear, and this Court should affirm the district court's conclusion that D.C. law does not "permit[] a party to a contract to enforce an arbitration provision *against* a third-party beneficiary." JA328.

### B.   Uber Conflates Third-Party Beneficiary Doctrine with Equitable Estoppel, which it Has Forfeited.

In arguing D.C. law allows it to enforce the Terms against Carroll as a third-party beneficiary, Uber cites cases applying an *equitable estoppel* theory to conclude that a non-signatory who invokes the benefit of a contract can be bound by it. But Uber has forfeited any equitable estoppel argument by not developing it in the district court, *Apprio, Inc.*, 104 F.4th at 910, or in its opening brief, *Jones Lang LaSalle Americas, Inc. v. NLRB*, 128 F.4th 1288, 1297 (D.C. Cir. 2025).

Equitable estoppel applies where a party has invoked or relied on the benefits of a contract and later seeks to avoid corresponding obligations or effects of that same contract. *Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1212 (D.C. 2002). In other words, it applies to *bind* non-signatories to a contract because they are seeking to benefit from the contract in litigation, whereas D.C.'s third-party beneficiary doctrine can only *benefit* non-signatories.[7]

Uber conflates these distinct theories and relies on cases applying equitable estoppel principles to suggest that D.C. law allows enforcement against a non-signatory under a third-party beneficiary theory. Opening Br. at 42-43, 49-50. For example, Uber cites *Hartenstine v. Uber Technologies, Inc.*, 753 F. Supp. 3d 1 (D.D.C. 2024), where the court concluded that a guest rider was *estopped* from avoiding an arbitration agreement in the contract between Uber and his father. *Id.* at 5. The court explained that the rider, who, unlike Carroll, had his own Uber

---

[7] Contrary to Uber's contention, there is nothing inconsistent about holding that a third-party beneficiary rule cannot bind non-signatories, while equitable estoppel can. *See* Opening Br. at 43-44 (arguing that D.C. law on third-party beneficiaries "cannot be squared with long-standing District of Columbia law on equitable estoppel"). They are distinct doctrines, and a non-signatory can be bound under equitable estoppel principles without being a third-party beneficiary.

account, was bound to arbitrate in the location provided in his father's agreement because he had "enter[ed] (or at least attempt[ed] to enter) the Uber that his father ordered," *id.*, he had "reap[ed] the benefits of his father's contract," *id.* at 4, preventing him from arguing that his own agreement, rather than his father's, should govern. *See also* Opening Br. at 41 (citing *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 55 (D.D.C. 2006), which held that a non-signatory employer could bind a non-signatory international union to a collective-bargaining agreement because the latter had "receive[d] the benefit" of union dues, requiring it to then "shoulder a certain portion of the 'burden'" of arbitration);[8] *id.* at 42 (citing *Am. Bureau of Shipping v. Tencara Shipyards S.P.A*, 170 F.3d 349, 353 (2d Cir. 1999), which considered whether a party was "estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause); *id.* at 45 (citing to *Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976), which concluded a non-signatory could not "accept the benefits and

---

[8] In *Flynn*, the parties and the court assumed that the international union was a third-party beneficiary that could *enforce* the contract, 412 F. Supp. 2d at 53, and the only question was—given that status— whether equitable principles applied to bind it, *id.* at 53-55.

avoid the burdens or limitations of a contract");[9] *id.* at 47 (citing *Ruiz v. Millenium Square Residential Ass'n*, 466 F. Supp. 3d 162, 173-74 (D.D.C. 2020) (applying the "doctrine of estoppel")).[10] None of these cases support enforcement under a third-party beneficiary theory.

The district court thus correctly applied D.C.'s third-party beneficiary law—not equitable estoppel—to conclude that Uber could not enforce the agreement with Cheryl against Carroll.

### C.  Carroll Is Not an Intended Beneficiary of the Terms, Nor Did He Seek to Benefit from Them.

Even if this Court accepts Uber's theory that—contrary to established D.C. law—signatories can enforce contracts against third-party beneficiaries, it cannot do so here. For one, it cannot show that its Terms were intended to directly benefit Carroll such that he is a third-party beneficiary. For another, even if it could show that the parties

---

[9] *Trans-Bay* used the words "third-party beneficiary" to describe the non-signatory at issue because that same entity sought to *enforce* the contract as a third-party beneficiary. 551 F.2d at 378. After concluding it was a third-party beneficiary for that purpose, this Court applied equitable estoppel principles to conclude that, by seeking to enforce the contract, the non-signatory was estopped from arguing the contract should not be enforced against it. *Id.*

[10] Uber's remaining cases apply state laws from other jurisdictions and have no bearing on D.C. third-party beneficiary law. *See* Opening Br. at 42-43, 49-50.

intended to benefit Carroll through the Arbitration Agreement, he has not accepted that benefit. Nor has Uber shown that he has sought to "avail[] himself of" the contract generally. *See* Opening Br. at 40.[11]

### 1. Carroll is Not an Intended Beneficiary.

The district court correctly concluded that Uber failed to meet its burden to establish that Cheryl and Uber mutually intended to directly benefit Carroll. *See* JA323. To be a third-party beneficiary, the contract must be "intended for [the non-signatory's] *direct* benefit." *Guam Indus. Servs.*, 441 F. Supp. 2d at 26 n.7. D.C. courts review contracts "as a whole" to determine whether a benefit is direct or "incidental." *W. Union Tel. Co. v. Massman Const. Co.*, 402 A.2d 1275, 1277 (D.C. 1979). An incidental beneficiary "will be benefited by performance of a promise," Restatement (Second) of Contracts § 315,[12] maybe even "predictably" so, *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 313 (1st Cir. 2025), but they are "by definition, one not intended to benefit from the contract

---

[11] Again, this "avail[] himself of the benefit" test posited by Uber is an effort to make Uber's forfeited equitable estoppel argument by a different name.

[12] D.C. courts "look to the Restatement '[i]n the absence of any current well-developed doctrine in [their] jurisdiction.'" *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, 412 F.3d 156, 164 (D.C. Cir. 2005).

and therefore unable to enforce it or to claim any rights under it," Williston on Contracts § 37:9.

The Terms of Use, "as a whole," *W. Union Tel. Co.*, 402 A.2d at 1277, do not indicate that Carroll is a direct, rather than incidental, beneficiary of the agreement. As the district court found, the language of the Terms does not once mention guest rides as a covered "Service[]," nor does it mention a user's ability to order a ride for a guest. JA329. Instead, the Terms concern the relationship between the user—here, Cheryl—and Uber as to the user's *own* use of Uber's services: Uber agrees to provide a set of delineated services to the user, and the user agrees to abide by certain terms in return. The Terms describe, for example, how Uber will "facilitate [the user's] connection to independent third party providers, including drivers and restaurants," JA125; in return, they require the user to abide by the Uber community guidelines, JA127-28. Users must also agree to receive text messages or calls from Uber, JA128, and the Terms advise the user that they may be subjected to a fee if they cause damage to a car or property that requires repair or cleaning, among other things, JA130.

Nowhere are any of the benefits or obligations extended to guest riders like Carroll.[13] To the extent Carroll benefitted by taking Uber rides called by Cheryl, that was a benefit of Uber's "performance" of the Terms, not from his contractual rights as an intended beneficiary. Carroll, as a non-signatory, cannot be bound by the Terms where the consequences of performance confer only an "indirect[]" benefit on him "incidental to the prime purposes of the parties." *Guinn Co. v. Mazza*, 296 F.2d 441, 443 (D.C. Cir. 1961). Here, the "prime purpose of the parties" was to provide Cheryl with Uber's services and to bind Cheryl to certain obligations when using those services. And Carroll's "indirect interest in the performance" of Cheryl's contract with Uber is insufficient to transform him into an intended beneficiary. *Fort Lincoln Civic Ass'n*, 944 A.2d at 1064; *see also Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 90 (D.D.C. 2004) ("[M]ere awareness that a third party may derive a benefit from a promissor's performance under a contract is

---

[13] Uber points only to a reference about the user's obligations regarding unaccompanied minor guests. Opening Br. at 46. That reference to the *user*'s obligations does not show it was intended to extend obligations or benefits to adult guest riders like Carroll.

insufficient to elevate the third party to the status of an intended beneficiary.").

The Terms explicitly mention third parties just once, in the Arbitration Agreement, which says that it "shall be binding upon, and shall include any claims brought by or against third-parties, including . . . spouses." JA123. Uber relies on this language to argue that the "Terms are intended to benefit guest riders" like Carroll, Opening Br. at 46, but there is no specific reference to guest riders and nothing in the text that provides reason to think that was the primary intent of this provision. Restatement (Second) of Contracts § 302, cmt. a ("A court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract."). That sole reference is insufficient to transform the *entire* Terms into a contract "intended for [Carroll's] direct benefit." *Guam Indus. Servs.*, 441 F. Supp. 2d at 26 n.7.

Moreover, as the district court found, the plain language of the Agreement only purports to bind, not benefit, spouses like Carroll. JA329; JA123. The Agreement states that it "shall be *binding upon*, and shall include any claims brought by or against third-parties," and

reiterates that, "[t]o the extent that any third-party beneficiary to this agreement brings claims *against* the Parties; those claims shall also be subject to this Arbitration Agreement." JA123 (emphasis added). By purporting to bind Carroll to arbitrate any of his claims against Uber (or Cheryl), the language referring to third parties is drafted to benefit Uber, not Carroll. Thus, Uber cannot "through the backdoor of an arbitration clause turn Carroll into a third-party beneficiary to the Terms that only Cheryl agreed to." JA329.

Uber argues that Carroll does in fact benefit from the Arbitration Agreement because it applies to claims "against third parties," so Carroll could also compel claims brought by Uber against him into arbitration. Opening Br. at 49.[14] But, to the extent compelling Uber into arbitration could be a benefit to Carroll, it is illusory here. The Arbitration Agreement would not apply to most—if not all—claims Uber could have

---

[14] Uber cites (at 49-50) a few out-of-circuit cases where courts have determined that a guest rider is a "third-party beneficiary." They are distinguishable on their facts. *See, e.g.*, *Hamilton v. Uber Techs, Inc.*, 2023 WL 5769500, at *5 (S.D.N.Y. Sept. 7, 2023) (plaintiff did not dispute he was "a third-party beneficiary" and had previously created Uber account); *Hughes v. Uber Techs., Inc.*, 718 F. Supp. 3d 571, 582 (E.D. La. 2024) (interpreting different version of terms that contained express reference to guest riders).

against Carroll. It covers disputes, claims or controversies "arising out of or relating to" the Terms themselves; the user's "access to or use of the Services at any time"; "incidents or accidents resulting in personal injury" that the user alleges "occurred in connection with [the user's] use of the Services"; or the user's "relationship with Uber." JA123. In other words, the agreement merely channels disputes concerning performance of the Terms' substantive provisions—which apply only to Uber and Cheryl—into a different forum. Because Carroll is not the "user," does not have a contractual relationship with Uber, and is not a beneficiary of any of the rest of the provisions in the Terms, he will not benefit from arbitration because any claims against him by Uber are unlikely to arise out of Cheryl's agreement with Uber or Cheryl's use of Uber's services, and therefore do not fall within the Agreement's scope.

As a last resort, Uber draws on post-contracting behavior to bolster the scant references to Carroll (or any third party) in the Terms, arguing that Carroll is an intended beneficiary because Cheryl "requested and paid for a ride for Mr. Walker using Uber's services" and "[u]sing the interface that Uber developed and offered specifically for the purpose of arranging rides for guest riders, she entered Mr. Walker's name and

phone number when requesting the trip." Opening Br. at 44-45. But "third-party beneficiary theory looks to the parties' intentions at the time the contract was executed," not their actions after they contracted. *Oehme*, 902 F. Supp. 2d at 100 (quotation omitted). Thus, Cheryl's actions when she later ordered an Uber for Carroll are irrelevant to what the parties intended *at the time* Cheryl and Uber purportedly contracted.

### 2. Carroll Has Not Sought to Benefit from the Contract.

Even if the parties intended to benefit Carroll, third-party beneficiaries are entitled to "reject a promised benefit." Restatement (Second) of Contracts § 306 cmt. b; s*ee Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*, 153 F. Supp. 3d 338, 342 (D.D.C. 2016) (explaining that "[i]t is black letter contract law that a third party beneficiary is entitled to reject a promised benefit . . . and when this occurs, the effect on the promisor's duty to the beneficiary is the same as if no promise had been made," and holding that settlement agreement could not be enforced against third-party beneficiary (citation modified)). Even if Uber and Cheryl had intended to confer the "benefit" of the arbitration agreement on Carroll, Carroll has rejected that benefit by choosing to litigate in court. Uber fails to cite *any* authority "that says a

contract (here, the arbitration agreement) can be enforced against an intended third-party beneficiary who has not accepted the benefit (here, the right to compel arbitration)." *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1305 (10th Cir. 2017).

Uber contends it can nonetheless bind Carroll because he is an intended beneficiary and "availed himself of the benefit" of the contract generally by taking the Uber ride. *See* Opening Br. at 40. As described above, there is no evidence the parties intended Carroll's Uber ride to be a direct benefit of the contract, which does not mention guest rides at all. So, in taking the ride, Carroll was not accepting any intended benefit of the Terms. *See* section III.C.1, *supra*.

Uber relies (at 44-47 and 49-50) on estoppel cases like *Hartenstine* in support of its argument.[15] Those cases do not apply here because they don't concern third-party beneficiary doctrine. *See supra* section III.B. And Uber's argument fails even under those cases.[16] Under an equitable

---

[15] In every single one of the rideshare cases Uber cites (at 49-50), including *Hartenstine*, the guest rider had created their own Uber account, unlike Carroll here.

[16] To the extent Uber's brief can be read to make a standalone equitable estoppel argument (which would be forfeited, *see* section III.B, *supra*), it too fails for the reasons described in this section.

estoppel theory, a non-signatory can be found if they seek "direct benefits" from a contract, seek to enforce the terms of a contract, or assert claims that can only be decided by reference to the contract. *Oehme*, 902 F. Supp. 2d at 98.[17] None of those circumstances are present here. Carroll has not sought to enforce the Terms, and his claims are for common-law torts, not breach of contract. *Id.* at 99 (noting that "[i]n the mine run of cases holding a nonsignatory bound under equitable estoppel, including those doing so based on the receipt of 'direct benefits' rather than the assertion of contract-based claims, the nonsignatory had sued the signatory based in part on the agreement at issue" and finding no equitable estoppel where that was not the case). And while Uber is correct that Carroll's claims would not have arisen without Cheryl creating an account, Opening Br. at 50, that is insufficient to show that he is seeking to "benefit" from the Terms. *See Usme v. CMI Leisure Mgmt,*

---

[17] Though D.C. courts have applied these equitable estoppel rules to arbitration agreements, D.C.'s general equitable estoppel law is far more stringent, requiring misrepresentation and detrimental reliance. *See Cassidy v. Owens*, 533 A.2d 253, 255 (D.C. 1987). Now that *Morgan* has clarified that arbitration agreements must be treated like all other contracts, 596 U.S. at 418, it is not clear whether D.C. courts would apply this arbitration-specific test. But, regardless of the test, equitable estoppel cannot be used to enforce the agreement against Carroll here.

*Inc.*, 106 F.4th 1079, 1090 (11th Cir. 2024) (finding it true that "but for" the agreement at issue, workers would not have been employed or had statutory employment claims but concluding that "this is the kind of but-for relationship we have deemed insufficient to warrant equitable estoppel"). Finally, Carroll's claims do not require reference to the Terms, as they are based on Uber's actions in causing Carroll's accident, not the terms of its contract with Cheryl. Thus, enforcing the Arbitration Agreement against Carroll in these circumstances "would make no sense" because he would "be bound to a contract without knowing its terms or ever realizing some benefit." *Jacks*, 856 F.3d at 1305.

## CONCLUSION

For these reasons, this Court should affirm.

Dated: August 25, 2025          Respectfully submitted,

                                */s/ Shelby Leighton*
                                Shelby Leighton
                                Lucia Goin
                                Leah M. Nicholls
                                PUBLIC JUSTICE
                                1620 L St. NW, Ste. 630
                                Washington, DC 20036
                                (202) 797-8600
                                sleighton@publicjustice.net
                                lgoin@publicjustice.net
                                lnicholls@publicjustice.net

David E. Haynes
THE COCHRAN FIRM, D.C., PLLC
1666 K St. NW, Ste. 1150
Washington, DC 20006
(202) 682-5800
dhaynes@cochranfirm.com

*Counsel for Plaintiff-Appellee*

## ADDENDUM

All applicable statutes are contained in the Statutory Addendum to Appellants' Opening Brief.

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 12,998 words. This document complies with the typeface and type-style requirements of Fed. Rs. App. P. 32(a)(5) and 32(a)(6) because it has been prepared using a 14-point proportionally spaced font that uses serifs, and it is set in a plain, roman style, excepting italics occasionally used for emphasis.

Dated: August 25, 2025

*/s/ Shelby Leighton*
Shelby Leighton

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I certify that on August 25, 2025, the foregoing was filed electronically with the Clerk of Court through CM/ECF, which will send notification of this filing to counsel of record in this matter.

Dated: August 25, 2025

/s/ *Shelby Leighton*
Shelby Leighton

*Counsel for Plaintiff-Appellee*