# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 1, 2025 Decided August 28, 2026

No. 24-7154

CHERYL WALKER,
APPELLEE

v.

UBER TECHNOLOGIES, INC., ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-03796)

*Michael R. Huston* argued the cause for appellants. With him on the briefs were *Jacob Taber* and *Jonathan I. Tietz*. *James A. Frederick* entered an appearance.

*Shelby H. Leighton* argued the cause for appellee. With her on the brief were *Lucia Goin*, *Leah Nicholls*, and *David Haynes*.

*Jeffrey R. White* and *Matthew Wessler* were on the brief for amicus curiae American Association for Justice in support of appellee.

Before: SRINIVASAN, *Chief Judge*, MILLETT and PAN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: As part of its ubiquitous ride-hailing service, Uber permits a user to order "guest rides" for third parties remotely. Guest riders can travel unaccompanied by the user and need never have downloaded Uber's app or created an account themselves. This case concerns what legal obligations a guest rider owes to Uber by virtue of using the service.

After Cheryl Walker used her Uber account to call a guest ride for her husband Carroll, an accident during the ride left Carroll with severe injuries. The Walkers sued Uber, but the company asserted that Carroll's claims arising from the accident were covered by an arbitration clause in its Terms of Use. According to Uber, Carroll was bound to arbitrate either by his own contract with Uber, ostensibly formed when he took the guest ride, or by Cheryl's contract with Uber. The district court rejected those arguments, and we affirm.

Uber's attempt to compel arbitration of Carroll's claims fails for a straightforward reason: Carroll never agreed to be bound by Uber's Terms of Use. Uber relies on its having sent Carroll a text message before the guest ride that included a hyperlink to the Terms and stated that taking the ride would manifest his assent to them. But Uber cannot show that Carroll ever saw its unsolicited message, and contract law imposes no duty to read a contract that one does not know exists. Uber alternatively submits that Carroll could be separately bound to arbitrate his claims under Cheryl's contract with Uber. Carroll does not seek to enforce his wife's contract, however, and he had no more notice of *its* terms when he took the guest ride.

That leaves no basis to bind Carroll to a contract to which he was not a party.

I.

A.

As nearly everyone nowadays presumably knows, Uber provides an app-based platform for users to connect with drivers for on-demand transportation services. Users download Uber's smartphone app, register for an account, and request rides by inputting their desired pick-up and drop-off locations.

The app also allows users to request "guest rides" for third parties by inputting the guest's location, name, and phone number. Once the guest-ride request is matched with a driver, Uber sends the guest a text message with ride details including information identifying the car and confirming the time and place for pickup.

Use of Uber's app is subject to its Terms of Use. *See* Uber U.S. Terms of Use §§ 1, 3 (Jan. 18, 2021) (J.A. 122, 125–26). In the version of the Terms in effect at the relevant time, Section 2 of the Terms contained an Arbitration Agreement. *See id.* § 2 (J.A. 123–25). The Agreement prescribed "settle[ment] by binding arbitration" of "any dispute, claim or controversy in any way arising out of or relating to" use of the services, including, among other things, "incidents or accidents resulting in personal injury that [the user] allege[d] occurred in connection with [their] use of the [s]ervices." *Id.* (J.A. 123). The Agreement also made its obligations "binding" as to "any claims brought by or against any third-parties, including [users'] spouses, heirs, third-party beneficiaries and assigns, where their underlying claims are in relation to [users'] use of the [s]ervices." *Id.*

To access Uber's app and services, users must affirmatively register their acceptance of the Terms. When users first download and sign into Uber's app, they encounter a "blocking pop-up screen" containing a hyperlink to the Terms and urging users to review them. *See* Decl. of Todd Gaddis in Supp. of Defs.' Mot. to Compel Arb. at 3–4, ¶¶ 8–10, *Walker v. Uber Techs., Inc.*, No. 23-cv-3796 (D.D.C. Jan. 29, 2024), Dkt. 9-2 (Gaddis Decl.) (J.A. 91–92). If users click on the hyperlink, they are directed to a new screen that displays a scrollable version of the Terms. While nothing requires users to click the hyperlink, much less read the full Terms, the pop-up screen "preclude[s] use" of the app until users "click [a] checkbox on the screen and . . . [a] large 'Confirm' button at the bottom of the screen" attesting that they have reviewed the Terms and agree to be bound by them. *Id.*

Uber has designed the process for attempting to obtain guest riders' assent to the Terms very differently. To provide notice of the Terms, Uber relies on the text messages it sends guest riders. Those messages, in addition to conveying the ride details, advise that, "[b]y taking this trip, you agree to the Uber Terms of Use & Privacy Policy," followed by a bright blue and underlined link to the Terms. Gaddis Decl. at 5, ¶ 17 (J.A. 93). If the recipient clicks that link on a phone with internet access, the Terms will load in the phone's browser. Nothing in the design requires the guest rider to register for an Uber account, download the app, or expressly confirm their acceptance of the Terms. Indeed, Uber seemingly has no way of confirming whether guest riders ever see or open the text messages before taking the guest rides.

B.

1.

This case arises from an accident during a guest ride that Cheryl Walker called for her husband, Carroll Walker, in 2021. The following facts are uncontested except where, as noted, they relate to the as-yet-untested allegations in the Walkers' complaint.

Cheryl began using Uber in August 2017, and she later agreed to the Terms applicable here via the pop-up-screen process. Cheryl used Uber's services many times over the years, including on six occasions to call a guest ride for Carroll. Each time, Cheryl entered Carroll's phone number into the app and Uber sent Carroll the guest-rider text message. Carroll, however, maintains that he never saw or read any texts from Uber—in fact, he says he "do[es] not read or reply to text messages" as a rule. Aff. of Carroll Walker at 2, ¶ 7, *Walker v. Uber Techs., Inc.*, No. 23-cv-3796 (D.D.C. Feb. 27, 2024), Dkt. 15-1 (Carroll Aff.) (J.A. 271–72). And Carroll never downloaded the Uber app or created his own account with Uber. *Id.* at 1, ¶ 1 (J.A. 271).

On the morning of March 18, 2021, Cheryl again used the Uber app to order a guest ride for Carroll. Uber sent Carroll its standard guest-rider text message, which advised him that an "Uber from Cheryl [was] arriving in 10 minutes." Gaddis Decl. at 5, ¶ 17 (J.A. 93). Carroll did not see the message. Carroll Aff. at 1, ¶ 2 (J.A. 271). Instead, as was the Walkers' standard practice in such situations, Cheryl called Carroll to "advise him of the Uber vehicle that was arriving to pick him up." Aff. of Cheryl Walker at 1, ¶ 2, *Walker v. Uber Techs., Inc.*, No. 23-cv-3796 (D.D.C. Feb. 27, 2024), Dkt. 15-2 (Cheryl Aff.) (J.A. 273); *see* Carroll Aff. at 2, ¶ 6 (J.A. 272).

Carroll evidently located and entered the Uber without incident. But during the ride, the Walkers allege, the driver became distracted by notifications sent through Uber's driver app and confused by directions given by the app. The driver turned the wrong way down a one-way road into oncoming traffic, and a horrific crash ensued. Carroll suffered severe injuries that ultimately required amputation of both his legs above the knee.

2.

Seeking to hold Uber responsible for the accident, Cheryl Walker sued in federal district court. On behalf of Carroll, Cheryl asserted vicarious and direct negligence and products liability claims related to Uber's design of its app for drivers. Uber moved to compel arbitration of those claims, *see* 9 U.S.C. § 4, contending that Carroll was bound by the Terms and their arbitration provisions in connection with the guest ride. *See generally* Mem. in Supp. of Defs.' Mot. to Compel Arb., *Walker v. Uber Techs., Inc.*, No. 23-cv-3796 (D.D.C. Jan. 29, 2024), Dkt. 9-1 (Mot. to Compel Arb.).

Uber first argued that Carroll had directly contracted with Uber when he took the guest ride while on "inquiry notice" that doing so would manifest assent to the Terms. Uber relied on a declaration from a Data Science Manager at the company, representing that Uber had sent Carroll a text message before the guest ride with a "bright blue" and "underlined" hyperlink to its Terms. Gaddis Decl. at 5, ¶ 17 (J.A. 93). The declaration rendered the text of the message as follows:

> Your Uber from Cheryl is arriving in 10 minutes. \n \nBy taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl. \n n\Track here/nhttps://trip.uber.com/Wu8vBbIYEf3A \n\nReply STOP to opt out from SMS notifications.

*Id.* Although Uber could not show that Carroll ever saw that message, it maintained that inquiry notice is based on an objective standard and that a reasonable person in Carroll's position would have seen and read it.

Alternatively, Uber asserted that Carroll was bound by Cheryl's agreement to the Terms' arbitration provisions, which covered "claims" brought by "third parties, including spouses," that "relate[d] to the use of" the covered services. Terms § 2 (J.A. 83). Although Carroll was a "non-signatory" to Cheryl's agreement with Uber, he was, according to Uber, an intended "third-party beneficiary" who had "received a direct benefit flowing from" the agreement—a guest ride—and therefore "should be estopped from refusing to arbitrate" his own claims arising from Cheryl's use of Uber's services. Mot. to Compel Arb. at 28 (J.A. 83).

Rejecting Uber's arguments, the district court denied the motion to compel arbitration as to Carroll's claims. *See Walker v. Uber Techs., Inc.*, 749 F. Supp. 3d 134, 140 (D.D.C. 2024). The court first determined that Uber's text message had not placed Carroll on inquiry notice of the Terms. *Id.* at 148. That message appeared to be "far from plain English," and although it contained a hyperlink to the Terms, the link did not appear until after several lines of text about the ride plus "two '/n's, the meaning of which is not apparent." *Id.* (quoting Gaddis Decl. at 5, ¶ 17). Uber also had "not demonstrated that a preview of the text message" on a standard smartphone screen "would have signaled to Carroll that his Uber trip was subject to the Terms"; and without any reason to think Carroll had seen the message's key text, its "mere receipt" was "not enough to establish . . . inquiry notice." *Id.* at 149. Additionally, the court concluded that Carroll was not an intended third-party beneficiary to the contract between Uber and Cheryl, and that, in any event, D.C. law did not permit "a party to a contract to

enforce an arbitration provision *against* a third-party beneficiary." *Id.* at 150 (emphasis in original).

Uber unsuccessfully moved for reconsideration, and it now appeals.

II.

The Federal Arbitration Act grants us jurisdiction over Uber's appeal of the district court's order denying its motion to compel arbitration. *See* 9 U.S.C. § 16(a)(1)(B). The district court properly treated that motion as one for summary judgment on the question whether a binding arbitration agreement existed between Uber and Carroll, with Uber bearing the burden. *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020). "We review the district court's resolution of [that] question de novo," *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008), applying "ordinary state-law principles that govern the formation of contracts," *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The parties agree that D.C. law governs here, so that is the law we apply. *See Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 790 (D.C. Cir. 2019). We conclude that D.C. contract law provides no basis to bind Carroll to the arbitration provisions in Uber's Terms of Use.

A.

We first consider whether Uber has met its burden to show that Carroll himself entered into an enforceable contract in connection with the guest ride. "In the District of Columbia and virtually everywhere else, for an enforceable contract to exist there must be both (1) agreement as to all material terms,

and (2) intention of the parties to be bound." *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (cleaned up).

Uber contends that Carroll objectively manifested his intent to be bound to the Terms by taking the guest ride. Absent express assent, which is lacking here, an offeree's conduct will manifest his intent to be bound only if he "knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19(2) (A.L.I. 1981); *see also Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005). Uber cannot show that Carroll ever acquired actual notice of the Terms or its prescribed method of accepting them. That leaves a theory that Carroll had "reason to know" he would be bound if he took the guest ride—in other words, that Carroll was on "inquiry notice" that taking the ride was subject to the Terms. The D.C. Court of Appeals has not yet decided whether inquiry notice is sufficient for contract formation. Even assuming inquiry notice suffices under D.C. law, however, Uber's theory is unavailing because it has failed to show that Carroll was on inquiry notice before taking the guest ride.

1.

Inquiry notice is attributed to a person when the information at their disposal would lead an "ordinarily prudent person" in the same position "to investigate [a] matter further." Black's Law Dictionary (12th ed. 2024). In contract, the circumstance that would lead an ordinarily prudent person to inquire further is typically knowledge of the existence of terms to which they will be bound. The "general rule" is that "one who signs a contract has a duty to read it": "absent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017) (quoting *Pers Travel, Inc. v. Canal Square Assocs.*, 804 A.2d

1108, 1110 (D.C. 2002)). So, when an offeree is "aware of the existence" of contract terms and chooses not to review them before manifesting assent, they will be bound notwithstanding the lack of actual notice of the terms. *See In re Est. of Fulton*, 287 A.3d 253, 261 (D.C. 2023).

The D.C. Court of Appeals has confirmed that, even for contracts entered into on the internet, a contracting party need not read terms to be bound by them. *See Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010–11 (D.C. 2002). *Forrest* concerned whether subscribers were bound by a forum-selection clause in Verizon's Internet Services Access Agreement. *See id.* at 1008–09. The Court held that "the existence of the clause was reasonably communicated" to subscribers even though "[m]any . . . presumably read the Agreement through a scroll box on their computer monitors, where only a small portion of the document was visible at any one time." *Id.* at 1010. Nothing required scrolling through all the provisions before "enter[ing] into" the Agreement by "clicking an 'Accept' button below the scroll box." *Id.* Still, the Court invoked the "general rule" that "one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Id.*

As the internet has evolved in the two decades since *Forrest*, courts have grappled with how to apply principles of contract formation to different kinds of web- and app-based interfaces. *See generally Domer v. Menard, Inc.*, 116 F.4th 686, 704–11 (7th Cir. 2024) (Hamilton, J., concurring in the judgment). Courts have continued to "routinely uphold" agreements when a user has clicked "I accept" or engaged in some equivalent affirmative action to demonstrate assent to contract terms directly presented on their screen. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). But what about a different configuration in which there is no affirmative

act of assent like clicking an "I accept" box, and assent to the terms instead is assumed merely from continued use of a website or app interface that contains a hyperlink redirecting the user to a separate screen containing the contract? Because that kind of configuration can "leave users unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance," courts have been "generally reluctant to enforce [] agreements" ostensibly entered into in this way. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (internal marks and citation omitted); *see, e.g.*, *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018). Absent any requirement that a user of a site or app expressly assent to contract terms, courts have found that the user is on inquiry notice only when a "fact-intensive inquiry" shows that the "layout and language" of the screen "presented to the consumer adequately communicate all the terms and conditions of the agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34, 1035 (7th Cir. 2016); *see Selden v. Airbnb, Inc.*, 4 F.4th 148, 155 (D.C. Cir. 2021).

Uber's argument in this case seeks to ground inquiry notice in much less. Under the design of Uber's guest-rider system, it never required Carroll to click on an "I accept" button or its equivalent, or to otherwise expressly confirm his acceptance of the Terms. Nor was Carroll presented with a website- or app-based interface that contained a link to the Terms and stated that taking the ride would manifest his assent to them. Instead, Uber simply sent Carroll a text message with that information and anticipated he would see it before taking the ride. But individuals are not on inquiry notice when they must "ferret out hyperlinks"—even when they are already using the apps or webpages on which the links appear. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014); *see also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32

(2d Cir. 2002) (Sotomayor, J.). It necessarily follows that an individual like Carroll is not on inquiry notice of the terms of a contract accessible via a hyperlink in a message he never even sees in the first place. In focusing on the layout and language of the text message it sent Carroll, Uber skips over a critical difference between this case and the mine run of internet-contracting cases: Carroll never saw the message, so it is irrelevant whether he would have been on inquiry notice from the message had he seen it.

It should come as no surprise, then, that Uber does not identify a single case in which mere receipt of an electronic message—without proof that the recipient even saw or must have seen it—has been held sufficient to establish inquiry notice of the terms of a contract available via a link in the message. To the contrary, cases addressing comparable facts have found that receiving a message with a link to contract terms does *not* suffice for inquiry notice when there is no evidence the recipient "became aware of or interacted with" the message. *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 273 (Me. 2022); *cf. Est. of Fulton*, 287 A.3d at 261 ("The mere sending of a statement by the creditor . . . and the silence of the debtor are not sufficient" to establish contract formation. (citation omitted)).

That result makes sense. Inquiry notice ensures that an offeree cannot avoid being bound by declining an opportunity to read contract terms; it does not empower an offeror to expect that the offeree will affirmatively seek out that opportunity or else be bound by undiscovered terms. After all, it is the party communicating contract terms that is positioned to ensure the recipient has a reasonable opportunity to review them, especially in the internet-contracting context in which service

providers design the technological systems through which contracts are made. *See Nguyen*, 763 F.3d at 1178–79.

Uber thus has tools at its disposal to ensure that guest riders see the text message and link to the Terms before they use Uber's services. Uber, for instance, could require guest riders to confirm receipt of the Terms by responding to its text message. To be sure, Uber is not obligated to design such a system. And there may be understandable business reasons for not wanting to put those kinds of potential obstacles in the way of a more seamless, efficient, and user-friendly rider experience. But affording those benefits to users comes at a cost, and Uber is not entitled to bind guest riders to contract terms that are never squarely presented to them.

2.

Uber identifies no sound basis—in D.C. law or beyond—to depart from standard principles of inquiry notice.

First, Uber suggests it is improbable that Carroll did not see the text message. But "the party asserting the existence of a contract has the burden of proof on that issue," *see Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995), and Uber cannot meet that burden if "[n]othing in the record negates [Carroll's] sworn declaration that he was unaware of the agreement," *Camara*, 952 F.3d at 375. True, Carroll concededly knew that the guest ride was part of a transaction involving Uber. But that hardly establishes Carroll knew of Uber's offer to contract with *him* as opposed to Cheryl, the person who registered for Uber's service and called the guest ride. The system Uber designed did not require guest riders to read the text messages Uber sent them before using the service. Nor did its system as a practical matter require guest riders to open the messages to obtain information about their rides. Carroll explained that Cheryl communicated the

ride details to him directly, and such an arrangement is hardly implausible. After all, *every* guest rider must be in direct contact with the primary Uber user at the time of arranging the ride (e.g., to specify the desired pick-up location and time before the primary user hails the ride).

Second, Uber contends that Carroll can be held on inquiry notice simply because any reasonable person in his position would have seen the message and hyperlink. That is not the law, and understandably so. As explained, inquiry notice of a contract's terms requires actual notice of the circumstances that would lead a reasonable person to inquire further into them—which is to say, actual notice that one is engaged in a transaction to which contract terms might attach. Divorcing inquiry notice from that underlying actual notice would leave it without any sound footing. There can be no "duty to read" a contract one does not know exists. *Pyles*, 172 A.3d at 907. Nor can one assume the risk of accepting unread terms without actual knowledge of the risk. *Cf. Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997); *Sinai v. Polinger Co.*, 498 A.2d 520, 526 n.10 (D.C. 1985). And consider how far-reaching the implications of Uber's theory would be: any person who fails to remain alert to incoming contract offers could unwittingly incur obligations as they went about everyday life. Ultimately, Uber's theory would negate the basic principle that "it is impossible for an offeree actually to assent to an offer unless he knows of its existence." *Glover v. Jewish War Veterans of U.S., Post No. 58*, 68 A.2d 233, 234 (D.C. 1949) (quoting 1 Samuel Williston, The Law of Contracts § 33 (rev. ed. 1936)).

In any event, we disagree that an objectively reasonable person in Carroll's position necessarily would have read the text message from Uber before taking the guest ride. The reasonable-person standard looks to "the ordinary behavior,

perspective, and expectations of consumers engaged in the type of transaction at issue." Restatement of the Law, Consumer Contracts § 1(b) (A.L.I. 2022). At least until they enter the vehicle, the guest rider's relationship to Uber's service is entirely passive; they need never have interacted with the company in any way. In that context, it is far from apparent that a reasonable person would expect to receive an unsolicited text message calling for them to examine voluminous contract terms in the short window before their ride arrives. And although Carroll's practice of never reading text messages may be idiosyncratic, there is no legal duty to perpetually monitor one's phone for incoming messages that may contain contract terms interspersed with other text. *Cf. Edmundson v. Klarna*, 85 F.4th 695, 703–04 (2d Cir. 2023) (A "reasonably prudent" smartphone user is not "highly savvy and sophisticated" or "someone who spends all waking hours using some kind of technology."); *Selden*, 4 F.4th at 156 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.").

Lastly, Uber, both in its motion for reconsideration and on appeal, devotes significant energy to arguing that the language and layout of its text message was sufficiently clear and conspicuous that it could have put Carroll on inquiry notice of the Terms—had he read it. But because we cannot look past the "had he read it" caveat for all the reasons explained, and because Uber has pointed to no decision that would support casting aside that caveat in comparable circumstances, our decision stands even assuming the message from Uber on Carroll's phone would have appeared exactly as Uber represents it. And because the proper disposition of Uber's motion to compel arbitration does not turn on those arguments,

the district court could not have abused its discretion in denying a motion for reconsideration entirely based on them.

B.

Uber next contends that Carroll was bound by Cheryl's agreement to the Terms' arbitration provisions even though he was not party to that agreement. As a general matter, arbitration agreements remain subject to "'traditional principles' of state law [that] allow a contract to be enforced by or against nonparties to the contract," including the "third-party beneficiary" and "estoppel" doctrines Uber invokes. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quoting 21 Richard A. Lord, Williston on Contracts § 57:19 (4th ed. 2001)). D.C. law recognizes both doctrines; and although the D.C. Court of Appeals appears not to have specifically applied them to arbitration agreements, we assume for purposes of our analysis here that it would. We conclude, however, that neither the third-party beneficiary doctrine nor the equitable estoppel doctrine binds Carroll to arbitrate his claims against Uber.

1.

Third-party beneficiary status is created at the time of contract formation and "requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." *Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp.*, 944 A.2d 1055, 1064–65 (D.C. 2008); *see* Restatement (Second) of Contracts § 315, cmt. (a). Under the Terms, Cheryl's agreement to arbitrate encompassed "any claims brought by or against any third[ ]parties," including "spouses," "where their underlying claims are in relation to" her use of Uber's services. Terms § 2 (J.A. 123). The Walkers deny that Cheryl intended to benefit Carroll when she agreed to the Terms. Uber responds that Cheryl at least intended to benefit Carroll when she called him a guest ride.

But even assuming that Cheryl intended to benefit Carroll in some relevant agreement with Uber, and that the Terms' arbitration provisions cover Carroll's claims, Uber cannot rely on the third-party beneficiary doctrine for a basic reason: Carroll is not seeking to enforce Cheryl's contract with Uber, nor did he otherwise consent to be bound by its terms.

A third party cannot be bound to a contract based on others' intentions alone. Rather, as the name suggests, a third-party beneficiary is a nonparty whom "the contracting parties intend . . . to *benefit* directly thereunder," and who therefore may "sue to enforce [the contract's] provisions." *Woodfield v. Providence Hosp.*, 779 A.2d 933, 937 (D.C. 2001) (citation omitted) (emphasis added). The doctrine serves as an exception to the rule that "a stranger to a contract may not bring a claim on the contract." *Ft. Lincoln Civic Ass'n,* 944 A.2d at 1064. The central duty created by the third-party beneficiary doctrine is not in the third party (who may not even know of the contract) but is in the party to the contract who promises to perform for the third party—which here would be Uber. *See id.* at 1064–65. So, if Carroll was an intended third-party beneficiary of the contract between Cheryl and Uber, that would simply mean he could sue Uber to enforce its obligations to Cheryl. That is a far cry from saying he incurred his *own* obligations *to Uber* from a contract to which he was not a party.

It is true that, once a third-party beneficiary sues to enforce a contract, the third party cannot avoid duties under the contract, including duties to arbitrate. *See, e.g.*, *Various Insurers v. Gen. Elec. Int'l, Inc.*, 131 F.4th 1273, 1277 (11th Cir. 2025); *Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976). That simply reflects the "general rule that the promisor may assert against the beneficiary any defense that he could assert against the promisee if the promisee were suing on the contract."

*Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370 (1984) (citing Restatement (Second) of Contracts § 309, cmt. (b)). If Carroll were suing to enforce Cheryl's rights against Uber (rather than the other way around), then he would stand in Cheryl's shoes in bringing the suit and Uber could assert the same defenses it would have against Cheryl, including the duty to arbitrate according to the Terms.

That rule has no application here because Carroll is not attempting to enforce Cheryl's rights under her contract with Uber. *See generally* Compl., *Walker v. Uber Techs., Inc.*, No. 23-cv-3796 (D.D.C. Dec. 21, 2023), Dkt. 1. Carroll instead brings tort claims against Uber related to the operation and design of its app for drivers. *See id.* at 31–44 (J.A. 37–50). Those claims involve a different app than the one for users that is subject to the Terms to which Cheryl agreed. And those tort claims are expressly grounded in duties of care that Uber allegedly owed Carroll under state law, not in any contract. *E.g.*, *id.* at 33–34, 42–44 (J.A. 39–40, 48–50). Carroll also brings claims seeking to hold Uber vicariously liable for the driver's negligence, and the underlying claim against the driver is also grounded in tort law, not any contract. *See id.* at 21, 23–28 (J.A. 27, 29–34).

In sum, Carroll's claims could equally be brought if Cheryl had never used Uber's services and Carroll had been involved in the accident as a pedestrian. And because Carroll does not seek to stand in Cheryl's shoes to assert claims under her contract with Uber, the third-party beneficiary doctrine affords no basis to bind him to the terms of that contract.

2.

Equitable estoppel provides a technically distinct, though related, basis to bind nonparties to contractual obligations. The estoppel doctrine provides that "a party with full knowledge of

the facts, which accepts the benefits of a transaction [or] contract . . . may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." *Fairman v. District of Columbia*, 934 A.2d 438, 443 (D.C. 2007) (citations omitted); *see* 4 Williston on Contracts § 8:3. A nonparty, then, cannot embrace a contract when convenient and repudiate it when inconvenient. Whether Carroll is estopped from denying that the arbitration provisions of Cheryl's contract with Uber apply to his own claims depends on whether he has embraced that contract to his benefit.

Uber contends that Carroll is estopped from avoiding arbitration because he embraced the contract between Cheryl and Uber by taking the guest ride. A nonparty may be subject to estoppel if it "*knowingly* seeks and obtains direct benefits from a contract." *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 98 (D.D.C. 2012) (cleaned up) (emphasis added). Even assuming the guest ride counts as a direct benefit that Carroll accepted under Cheryl's contract with Uber, Uber's argument still fails. We have explained that Carroll lacked actual or constructive notice of the terms on which that benefit was being offered, so he did not "knowingly" accept any benefit. *Id.*; *see supra* Part II.A. A party must have "full knowledge of the facts," including the existence of a relevant contract, before accepting a benefit for equitable estoppel to apply. *Fairman*, 934 A.2d at 443. And of course they must: someone who accepts a benefit without notice of the strings attached to it does not act "contrary to equity" by disavowing obligations that only later become apparent. *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000).

Uber also suggests that equitable estoppel could apply to Carroll's claims because the claims "must be determined by reference to" Uber's contract with Cheryl. *Oehme*, 902 F.

Supp. 2d at 98. That kind of intertwined-claims theory cannot help Uber for two reasons. First, while an intertwined-claims theory can "estop a *signatory* from avoiding arbitration with a nonsignatory," Carroll is a non-signatory plaintiff. *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001); *see also Riley v. BMO Harris Bank, N.A.*, 61 F. Supp. 3d 92, 99 (D.D.C. 2014). Second, for the theory to apply, there must be more than a "but-for relationship between the claims and the contract": the plaintiff must "actually depend" on the contract containing the arbitration agreement. *Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1088 (11th Cir. 2024) (citation omitted); *see* 21 Williston on Contracts § 57:19. But Carroll's claims, as explained, do not depend on the contract between Cheryl and Uber. Indeed, none of Carroll's claims even mentions Uber's Terms, reinforcing that each remains "fully viable without any reference" to them. *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1095 (9th Cir. 2020). As a result, there is no basis to estop Carroll from disavowing any obligation to arbitrate his claims.

* * * * *

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*